## Elizabeth D. Clark, Administratrix of Edward L. Clark, Deceased, Appellant, *v.* Jane Clark.

[Marked to be reported.]

*Gift—Confidential relation—Burden of proof—Evidence.*

Wherever one person obtains by voluntary donation a large pecuniary benefit from another, the burden of proving that the transaction is righteous is upon the person taking the benefit; but proof that the donor knew and understood what he was doing is sufficient.

Where the donee occupies a confidential relation to the donor, and the amount of the gift bears a large proportion to the estate of the donor, the donee must prove that the gift was made intelligently, and with a full knowledge by the donor of the true character of the transaction.

*Contract—Partnership—Relationship of parties.*

There is no rule either of law or morals binding a person to give better terms in a contract to his relative than to a stranger; and the existence of a relationship between two partners will not destroy the fairness of a contract of partnership, if the contract is such as would be fair between partners who were unrelated.

*Contract—Parent and child—Evidence.*

Where a contract between a mother and son is on its face fair, reasonable and conscionable, it may be enforced without proof that it was fully explained to the mother before she signed it, or that independent advice was obtained regarding it. It is the parental influence of the parent over the child, and not of the child over the parent, that requires the watchful care of the court.

A mother and son were partners in the iron business, in which the son owned one fifth and the mother four fifths. The mother did not participate in the management of the business, but all the work was done by the son. The son becoming dissatisfied, new articles of partnership were entered into by which the mother's interest was reduced to three fifths, and the son's increased to two fifths. This involved a transfer from the mother's account to the son's account of about $80,000. The mother was to have an assured income from the business of over $20,000 per annum, without any reference to the results of the business. The evidence showed that the increase in the son's share was made to induce him to remain in the firm, and continue the business. The contract was drawn by the attorney for the mother, who was also attorney for the firm. It also appeared that the business was a hazardous one, and required all the skill and ability which the son possessed to make it successful. Several years after the contract of partnership was entered into, the son died and his wife as administratrix of his estate filed a bill in equity against the mother for an account. *Held*, (1) that the contract on its face was fair, reasonable and conscionable; (2) that the increase of the son's interest was the

result of a contract and did not possess the faintest shadow of a gift; (3) that being fair and reasonable upon its face it did not require any explanatory testimony in its support; (4) that even if the agreement should be construed as involving a gift from the mother to the son, explanatory evidence was not required to support it, inasmuch as the rule requiring such evidence applies only to cases where the benefit passes from the child to the parent.

Argued Nov. 7, 1895. Appeal, No. 255, Oct. T., 1895, by plaintiff, from decree of C. P. No. 3, Allegheny Co., Feb. T., 1894, No. 227, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity for dissolution of partnership, for the appointment of a receiver, for an injunction, and for an account.

The case was referred to Thomas Patterson, Esq., as master, who reported the facts to be as follows :

In 1869 Wm. Clark, the husband of Mrs. Jane Clark and father of E. L. Clark, was a member of a partnership known as Wm. Clark & Co., composed of himself, his brother, Edward Clark, and his brother-in-law, Charles Fownes. Their business was the manufacture of iron into hoops, bands and ties ; it was conducted upon leased premises at the corner of Thirty-fifth street and the Allegheny Valley Railroad (Pittsburg), the plant being known as the Solar Iron Works.

In April, 1873, Charles Fownes died, and his widow, Sarah A. Fownes, succeeded to his interest, as representing his estate, in the firm of Wm. Clark & Co. His oldest son, Henry C. Fownes, shortly after his father's death, was given employment at the Solar Iron Works for the purpose of eventually taking his father's place in active participation in the business.

In the spring of 1879, Edward Clark died. At the time of his death his interest in the firm was twenty per cent of the capital stock. His will bequeathed one third part of his personal estate absolutely to his wife, and the remainder to E. L. Clark and H. C. Fownes in trust, to pay over the profits in equal shares to his daughter and two grandchildren until they severally arrived at the age of twenty-five years, when each was to receive his share in the principal; his investment in the firm of Wm. Clark & Co. to remain there as long as agreeable to the other partners.

Mr. Wm. Clark objected to a continuance of the Edward Clark estate in the firm, and as the result it was sold for the amount of the appraisement, viz, $33,918.14. Who were the purchasers of this interest is one of the mooted questions, upon which a considerable amount of testimony was taken, and which must be made the subject of a separate finding of fact. It need only be mentioned here, to preserve the continuity of the history, that the interest of Edward Clark was debited by certain charges against it and with the expenses of settling the estate, reducing it to $26,277.10. A bond for one third of this amount was given by Wm. Clark and Sarah A. Fownes direct to Mrs. Elizabeth Clark, the widow of Edward Clark, and the balance was represented by three notes of the same parties to H. C. Fownes and E. L. Clark, trustees under the will of Edward Clark. This transaction appears to have been completed on July 1, 1879. The stock standing in the name of Edward Clark was extinguished on that date, and so matters stood until October 31, 1879, when what evidently represents the same interest reappeared under the name of "special stock account," and is so carried forward on the books until the dissolution of the firm as hereafter noted on March 31, 1887.

On October 4, 1884, Wm. Clark, the senior member of the firm, died. By his will he devised and bequeathed all his property to his wife, Jane Clark, and made her and his two sons, E. L. and F. L. Clark, his executors. The widow renounced the right to act as executor, and the duties fell upon the two sons. The inventory and account are filed by them, though the evidence would seem to show that the actual and responsible management devolved upon E. L. Clark. The books of the concern show the several interests at the time of the death of Wm. Clark, as nearly as the same can be stated in percentages, as follows: Wm. Clark, 53 per cent; S. A. Fownes, 27 per cent; "special stock," 20 per cent. The inventory and account of the executors of Wm. Clark show his interest as given above. It is contended by the respondent that the interest is too small, and should be increased by a proportionate share of the special stock; but that is one of the matters to be considered when we come to a discussion of the ownership of that account.

From the time of Wm. Clark's death, down until 1887, the

business was conducted by E. L. Clark and H. C. Fownes, both young men of intelligence and business ability, who had grown up with the business. E. L. Clark had been at the works since the inception of the business in 1869, and H. C. Fownes since 1872. Clark had charge of the manufacturing and Fownes of the financial department.

On March 31, 1887, a dissolution was agreed upon, by which Jane Clark and E. L. Clark took the Solar Iron Works, and S. A. and H. C. Fownes certain interests in the Carrie Furnace and Zug & Co., which had been acquired by the firm. Each of these properties was put in at an agreed valuation, the terms being fully set forth in the dissolution paper. The paper was executed by all the parties together, Mrs. Clark, Mrs. Fownes, Mr. E. L. Clark and Mr. H. C. Fownes, and was witnessed by Mrs. Best, who was a daughter of Mrs. Fownes, and her husband. The paper recites the interests of the several parties in the old firm as follows: Jane Clark, $\frac{901}{1700}$; Sarah A. Fownes, $\frac{459}{1700}$; Edward L. Clark, $\frac{194}{1700}$; Henry C. Fownes, $\frac{146}{1700}$.

The Solar Iron Works, which was taken by E. L. Clark and Mrs. Clark, represented a book value, made up of the appraised value of the plant and the book accounts of $419,280.50. The proportions of each in this amount, in accordance with the percentages fixed in the dissolution paper was as follows: Mrs. Jane Clark, $340,444.22, or $81\frac{19}{100}$ per cent; E. L. Clark, $78,825.26, or $18\frac{81}{100}$ per cent.

On April 1, 1887, Mrs. Clark and E. L. Clark entered into a partnership agreement, exhibit No. 24, for the further conducting the business under the title of "Wm. Clark's Son & Co.," under which agreement Jane Clark held a four fifths interest, and E. L. Clark one fifth. In order to make the holdings of each in the capital of the firm correspond to the new division of interest, Mrs. Clark's interest was reduced from $340,444.22 to $304,000, and the difference, viz, 36,444.22 was placed to the credit of her expense account; and the stock of E. L. Clark was reduced from $78,836.26 to $76,000, the balance, to wit, $2,836.26 being carried to the credit of his expense account. The agreement of partnership of April 1, 1887, does not mention any figures, nor explain how the interests are altered; the agreement simply mentioned in the second paragraph: "The entire capital of said partnership is contributed in the following pro-

portion, that is to say, the said Jane Clark contributes the four-fifths part thereof, and the said Edward L. Clark the one-fifth part thereof."

Under this agreement the parties continued to operate the Solar Iron Works until some time after April 2, 1888. By an agreement, dated April 2, 1888, the capital was divided between them in the following proportions, viz: Jane Clark, $224,000, E. L. Clark, $156,000. The agreement is silent as to what fractional part of the capital stock this made.

Under this agreement the actual management of the business was thrown upon E. L. Clark, who, in the strongest terms, was given complete control and authority over the business. In event of the death of either of the parties the partnership was to continue, except that the personal representatives of E. L. Clark were given the right to demand a dissolution and winding up of the partnership; "but," to quote from the agreement, "the right to demand such winding-up and dissolution shall only apply to the personal representatives of said Edward L. Clark and not to those of said Jane Clark." The profits and losses were to be shared in accordance with the respective amounts of capital. There seems to have been originally contemplated an agreement with one William S. Sims, who was to contribute $20,000 to the capital stock; at least the agreement between Jane Clark, Sims and E. L. Clark, for the formation of a partnership on the same date, April 2, 1888, appears in evidence, the signatures being torn off; and the agreement finally entered into between Jane Clark and E. L. Clark is made up from the Sims agreement, which shows the pencil erasures and interlineations necessary to make it a draft of a new agreement.

While the agreement bears date April 2, 1888, yet it was not actually executed until some weeks later. On July 18, 1888, E. L. Clark handed to G. W. Kemp, the bookkeeper, a memorandum, as follows:

" Jane Clark, stock account, . . . . . $80,000
" To E. L. Clark, stock account, . . . 80,000
" As per partnership agreement, dated April 2, 1888."

In accordance with this memorandum Mr. Kemp made appropriate journal and ledger entries, charging Mrs. Clark's stock account $80,000, and crediting E. L. Clark's stock account with the same amount, the effect of which was to reduce Mrs. Clark's

stock from $304,000 to $224,000, and to increase E. L. Clark's from $76,000 to $156,000.

By agreement, dated April 3, 1888, though probably not executed for several months thereafter, an arrangement was made between E. L. Clark and Mrs. Jane Clark, by which, in consideration of a guaranty by E. L. Clark to Mrs. Jane Clark of a profit of ten per cent per annum upon her interest in the partnership, Mrs. Clark released her right to her proportionate share of the profits, and agreed that all the profits which might accrue to her share, over and above the ten per cent guaranteed her, should be received and taken by E. L. Clark. Upon the death of E. L. Clark his personal representatives were to have the right to terminate the agreement upon notice.

As in the case of the partnership agreement of April 2, 1888, this ten per cent guarantee arrangement seems to have been first constructed for the partnership with Sims; at least there is an agreement, which recites the partnership with Sims, and which, in the same terms as the agreement, already considered, guarantees on the part of E. L. Clark an annual profit of ten per cent on her capital stock invested, and Mrs. Clark agrees that E. L. Clark shall have all the profits accruing to her share over and above the guaranteed ten per cent. The language of the two instruments appears to be identical, with the exception of the references to the partnership with Wm. S. Sims, and the date is the same, viz, April 3, 1888.

These two agreements, the partnership one of April 2, 1888, and the ten per cent agreement of April 3, 1888, were executed in duplicate. The witnesses attesting the execution of the paper are G. W. Kemp, the bookkeeper, and R. P. Weldon, the assistant bookkeeper. While apparently attesting the execution of both parties, they were in fact only subscribing witnesses as to the signature of E. L. Clark, their attestation being placed on the paper in Mr. Clark's private office, when he alone was present. They did not see Mrs. Clark in the transaction.

After the agreements mentioned were executed in duplicate they were retained by E. L. Clark, and one set placed in the strong box in the safe at the Solar Iron Works, the other some time afterwards in a box rented for the purpose at the Safe Deposit Company.

In accordance with the terms of the ten per cent agreement,

entries were made each year on the books of Wm. Clark's Son & Co., crediting Mrs. Jane Clark with $22,400, being the guaranteed profit on her capital stock, with the exception of the last year, 1893, E. L. Clark not having given the direction to the bookkeeper to credit Mrs. Clark's account with the rental for that year at the time of his death.

After the death of E. L. Clark, the several agreements, including the Sims agreements, the dissolution paper of the firm of Wm. Clark & Co., the partnership paper of 1887, and a power of attorney from Mrs. Clark to E. L. Clark were found by F. L. Clark in the strong box at the Solar Iron Works and in the private desk of E. L. Clark, with the exception of the duplicate originals of the partnership paper of April 2, 1888, and the ten per cent agreement of April 3, 1888, which were found by F. L. Clark and Mrs. Elizabeth Clark, the widow of E. L. Clark, in his box at the Safe Deposit Company.

Going back to follow up certain collateral matters, on October 31, 1885, E. L. Clark and F. L. Clark filed their final account as executors of the will of Wm. Clark, and their duties as executors appear to have ceased with the filing of this account, except that, on May 27, 1892, E. L. Clark, as executor of Wm. Clark, signed an agreement to sell some stock of the estate in the Allegheny Valley Camp Meeting Association.

On April 12, 1886, Mrs. Jane Clark executed a power of attorney to E. L. Clark, in very broad terms authorizing him to receive moneys due her, make sale of her real estate, sign and accept commercial paper, " to assign and transfer any and all personal property, stocks, lands, evidences of indebtedness, interest or interests in any firm, partnership or association to which I may be entitled or to which I may hereafter be entitled," to bind her by indorsement and guaranty of commercial paper, "and by any other contract or contracts, and in my name and stead to transact all business, and to conduct and arrange my affairs in such manner as my attorney may deem proper." Mr. Clark acted under this power of attorney in making contracts, transferring stock, etc., continuously thereafter.

The business of the Solar Iron Works, both as conducted by Wm. Clark & Co. and Wm. Clark's Son & Co., had been very profitable. The profits of the concern from 1879 to 1888 were as follows :

For years 1879 and 1880 . . . . $104,722 38
" year ending Dec. 31, 1881 . . 74,443 48
"       "            " 1882 . . . 70,343 27
"       "            " 1883 . . . 28,956 59
"       "          , " 1884 . . . 51,435 64
"       "            " 1885 . . . 91,249 42
"       "            " 1886 . . . 72,971 58
"       "          Mar. 31, 1887 . . . 19,358 06
"       "            " 1888 . . . 18,125 64

The reason of the smallness of the profits for the year ending March 31, 1888, was a protracted strike when the mill was changed from a union to a nonunion one. The profits up to October, 1887, prior to the strike, had been about $5,000 per month.

After April 1, 1888, no inventory was taken for three years. From that time on the earnings of the company were as follows :

Three years ending Mar. 31, 1891 . . $200,339 34
For year ending Mar. 31, 1892 . . 119,818 67
"       "      "      " 31, 1893 . . 134,886 78

$455,044 79

The profits for 1892 and 1893 were nominally larger, but the statement given above deducts $10,000 from the former year and $15,000 from the latter year, which were charged back against the profits for depreciation in plant.

After the agreements of April 2 and 3, 1888, the withdrawals of Mrs. Jane Clark were considerably in excess of the $22,400 credited annually to her under the ten per cent agreement. Her withdrawals during the five years next ensuing averaged $33,000 per annum. E. L. Clark, on the other hand, did not draw the full amount of the profits coming to him under these agreements and so each year accumulated a credit balance with the concern. Taking the aggregate of the capital stock and expense account of each partner from April 1, 1887, down to April 1, 1893, we find the percentage of the interest of each in the total investment to be approximately as follows :

April 1, 1887, Mrs. Jane Clark . . . 81 per cent.
             E. L. Clark . . . 19     "
April 2, 1888, Mrs. Jane Clark . . . 61     "

April 2, 1888, E. L. Clark    .    .    .    39 per cent.
April 1, 1889, Mrs. Jane Clark  .    .    . 62    "
     E. L. Clark    .    .    . 38    "
April 1, 1890, Mrs. Jane Clark  .    .    . 71    "
     E. L. Clark    .    .    . 29    "
  " 1, 1891, Mrs. Jane Clark  .    .    . 48    "
     E. L. Clark    .    .    . 52    "
  " 1, 1892, Mrs. Jane Clark  .    .    . 39    "
     E. L. Clark    .    .    . 61    "
  " 1, 1893, Mrs. Jane Clark  .    .    . 32    "
     E. L. Clark    .    .    . 68    "

At the end of the period, on April 1, 1893, after crediting Mrs. Clark with the $22,400 for that year, and deducting from Mrs. Clark's stock account the balance against her on her expense account, her interest in the firm was $208,120.72, and E. L. Clark's interest being the aggregate of his stock account and the credit balance on his expense account, was $436,369.13.

After the death of E. L. Clark the management of the business and the custody of the books were taken charge of by F. L. Clark, the next oldest son, on behalf of his mother. After discovering the partnership papers and the ten per cent agreement, upon consultation with his counsel he charged back upon E. L. Clark's stock account $40,000 of capital, which E. L. Clark told him he was carrying for him, and credited his mother's stock with a like amount. He also charged back upon E. L. Clark's stock account some $6,000 of an indebtedness to the firm. Upon the capital of E. L. Clark, thus reduced to $110,000, he computed the share of the total profits for the period of the preceding five years, to which it would be entitled, and adding certain items of salary due from the firm and the Allegheny Bessemer Steel Co., and deducting the pro rata share of the expenses, arrived at a net result, showing E. L. Clark's total interest in the firm to be $163,435.95. This entry was made on May 15, 1893. Mrs. Jane Clark was not consulted either by F. L. Clark, or Mr. Dickey, his counsel, in regard to making this entry.

On May 18, 1893, Mrs. Elizabeth D. Clark, the widow of E. L. Clark, took out letters of administration on the estate of her deceased husband. For this purpose she went to the office of Mr. Dickey, and there she met Mrs. Jane Clark, Miss Agnes

Clark, Mr. H. G. O'Brien, Mr. Dickey and Mr. F. L. Clark. The amount of the interest of E. L. Clark, as shown by the entry on the books above recited, was given, either by Mr. Dickey or Mr. F. L. Clark, as the value of his holdings in the firm for the purpose of fixing the amount of the bond.

A memorandum, including the result of the book entry, appears to have been made and either handed or shown to Mrs. Elizabeth Clark by F. L. Clark, though the exact date at which this was done is not given. A rough copy of the book entry, was given to the appraisers, afterwards appointed, and was made the basis of an appraisement, prepared by them and sworn to on the 22d day of June, 1893, but never filed.

Mr. Dickey is under the impression that he communicated to Mrs. Elizabeth Clark certain doubts that he had as to the validity of the ten per cent agreement at the time of his visit to her on or about May 13, 1893; but Mrs. Clark evidently did not understand his reference, as she testifies that her first knowledge of any question as to the validity of this agreement was when the appraisers called on her, June 20, 1893, and handed her the paper, exhibit No. 96, and told her that the ten per cent agreement was void.

This completes the review of the facts of the case, which are not disputed, and a recital of which is necessary to a proper consideration of the controverted questions, both of fact and law.

Although the testimony is voluminous, yet the disputed questions of fact are few, and there is really no conflict in the testimony of the witnesses, more than would naturally arise from difference of recollection as to transactions and conversations after some interval of time had elapsed.

1st. The first and most important controversy arises over the ownership of the account on the books of Wm. Clark & Co., known as the "special stock account." This account, as we have seen, represented the interest of Edward Clark, brother of Wm. Clark, and one of the original members of the firm of Wm. Clark & Co.

On the 1st of July, 1879, this interest was transferred on the books of Wm. Clark & Co. to E. L. Clark and H. C. Fownes, executors of Edward Clark; on the same day the account was extinguished and the executors became creditors of the firm to the amount of the interest. On the 31st of October, 1879, the

interest reappeared on the books under the title of "special stock account," where it continued, sharing in the profits of the firm to the extent of one fifth, down to March 31, 1887, when E. L. Clark and H. C. Fownes, at the time of the dissolution of the firm, divided it in certain proportions between themselves.

There can be no doubt of the fact that the bond and notes of S. A. Fownes and Wm. Clark were given for this interest, that, in other words, their credit paid for it. There can be no doubt that the obligations given by Mrs. Fownes and Wm. Clark were paid by and charged against the profits earned by the special stock. Clearly Mrs. Fownes and Wm. Clark could have retained the interest, which their obligations purchased, and divided it, both principal and profits, among themselves. Equally it is clear that they could have made a gift of it to the two young men, who were identified with the business, and each of whom gave great promise of success. The question is, what was the fact? The answer, the master cannot regard as doubtful under the testimony. The considerations, which to his mind plainly show it to have been a gift, are these:

A. The manner in which the account was carried on the books. There was a reason for keeping it distinct, and charging against it the cost of its acquisition, if its ultimate destination was different from that of any other partnership property. There would be no reason for keeping it alive if the other partners owned it.

B. The manner of the transfer of the interest to special stock by the entry of October 31, 1879 : " E. L. Clark and H. C. Fownes, executors, for account of Wm. Clark and S. A. Fownes." The effect of this would seem clearly to extinguish the ownership of Wm. Clark and S. A. Fownes in the interest thus transferred, and to place that ownership in the proprietors, whoever they might be, of "special stock."

C. Because Wm. Clark on several different occasions and to different persons announced the fact that his son, Edward, and his nephew, H. C. Fownes, had an interest as partners in the business.

D. The direct testimony of H. C. Fownes, the only surviving party to the transaction, who distinctly and unqualifiedly testifies that he and E. L. Clark were the owners of this interest,

Wm. Clark having declined to purchase it for the other partners, or permit it to be carried forward as an interest of the estate, but having given his consent to its acquisition by his son and nephew, and having, together with Mrs. Fownes, assumed the responsibility of the payment of the purchase money.

Against these considerations it is argued that the obligations given by Wm. Clark and S. A. Fownes show ownership in them. This is undoubtedly true, but only presumptively. They could give the interest away, or they could originally acquire it on behalf of others, if they saw proper. The presumption certainly does not seem to the master strong enough to overcome the direct testimony that has been referred to.

It is also argued that H. C. Fownes and E. L. Clark, being executors of Edward Clark, could not acquire for themselves the interest which his estate held in the firm. While more strictly a question of law, the master may say in this connection that he does not think that this question enters at all into the present controversy; at most the transaction could only be attacked by some one in interest in the estate of Edward Clark. It may be remarked, however, in passing, that the master excluded offers by the plaintiff to show that the appraised value of the Edward Clark interest, at which it was acquired, was more than its real value, or more than could be secured for it by a winding up of the concern; and also it may be remarked that the interest was really and in effect acquired by the other parties and by them given to E. L. Clark and H. C. Fownes.

The master accordingly finds the fact that the interest carried on the books of Wm. Clark & Co. as "special stock account," and representing one fifth of the capital of the firm, was in fact owned by E. L. Clark and H. C. Fownes from October 31, 1879, to March 3, 1887.

2d: The next inquiry is as to the confidential relation existing between Edward L. Clark and his mother, Mrs. Jane Clark, as far as those relations may be found as a matter of fact.

We have already seen that E. L. Clark represented his mother as attorney in fact under a power of attorney, given in the year 1886, the powers contained in which were of a very broad description. He was also managing partner of the business under an article of partnership of April 1, 1887, which gave him complete control of the business. It also appears from the evi-

dence that he occupied a position, practically, as head of the family, fixing the allowances of the children, determining matters of expenditure, and in general taking much the place that his father had done. This relation is also quite clearly shown in the testimony of Mrs. Elizabeth Clark in her examination in chief, where she recounts an interview between E. L. Clark and his mother, in which he complains that his interest was too small, and that he was unwilling to stay with the firm, unless it should be increased.

He said this was a matter of business with him, and that his health was poor—wasn't good ; and that he had come to a time of life when he had to look after his own family as well as hers ; and she said she wanted him to continue in the business, and that she would increase his interest, and was willing to make any arrangement that was satisfactory to him, or that he would approve of.

Q. What, if anything, did he reply to this statement of his mother's ? A. He said he would rather go into business for himself, but if his interest was increased he would stay and look after her interest, and that she knew he would always take care of her.

On cross-examination she gives substantially the same reply, but with a little more fullness :

She said she was willing to increase his interest and make any arrangement that was satisfactory to him ; that she wanted him to go on with the business and look after her interest, as she knew he was capable of doing it, and knew that he could fill his father's position.

The testimony on both sides, which it is unnecessary to recite in detail, establishes the fact that E. L. Clark was a thoroughly equipped man of business, fully familiar with the details of his line of work, and in certain respects ahead of others in the same line, in adopting improvements, or making changes that would increase the profit of the plant. Mrs. Jane Clark, on the other hand, was a woman whose life was entirely circumscribed by her domestic duties, of but limited education, with no knowledge whatever of the business matters that were managed for her by her son Edward, and relying on her daughter Agnes to conduct her daily correspondence.

The master accordingly finds as a fact that a relation of trust

and confidence did exist between E. L. Clark and his mother, Jane Clark, in relation to his management for her of her business affairs and her interest in the Solar Iron Works, such relation arising not only out of his position as her attorney in fact and managing. partner, but also that, after his father's death, he, as eldest son, largely took his father's place as controlling the expenditure, education and movements of the members of the family.

3d. While not exactly a disputed question of fact, it would seem proper to find separately the extent of Mrs. Jane Clark's information as to the matters contained in the agreements. There is no evidence whatever that she received any independent advice as to the propriety of her entering into either of the agreements of April 2 and 3, 1888, or, for the. matter of that, any of the contracts exhibited in this case and bearing her signature. The other members of the family were in ignorance of the existence of such papers. There was nothing in the regulation of the expenses or movements of the family by E. L. Clark to suggest that such agreements existed. Thus his prohibition of the projected trip on the part of his mother, Sherman and Agnes to Europe in the Spring of 1889, on the ground that the business had not been profitable and she could not afford the expense seems inconsistent with such arrangement. Equally inexplicable is his contracting for cemetery improvements in 1891–92 of some $22,000, which was charged to Mrs. Jane Clark's account.

The master accordingly finds as a fact that, so far as the evidence shows, Mrs. Jane Clark received no independent advice as to the execution of the agreements of April 2 and 3, 1888, nor was the execution of said agreements the matter of any family consultation, nor was their existence known to any other members of the family of Jane Clark.

4th. It appears by reference to the answer, taken in connection with the testimony of Mrs. Elizabeth Clark, quoted to some extent above, that in the early part of 1888, Edward L. Clark did apply to his mother for an increase of his interest in the Solar Iron Works, on the ground that he had come to a time of life when he must provide for his own family ; that the work was hard and his health not good, and that Mrs. Clark did promise to give him an interest equal to a child's share, or about

$40,000 in the business. At this time Edward L. Clark held the one fifth under the agreement of April 1, 1887, and was in receipt of a salary of $5,000 per annum from the firm of Wm. Clark's Son & Co. and a salary of $7,500 per annum from the Allegheny Bessemer Steel Co. Whether or not the fact of his receipt of salaries to this amount was known by Mrs. Clark at the time she made this promise is not disclosed by the evidence.

5th. It should also be stated as a fact not in dispute that E. L. Clark was energetic and unremitting in his attention to the business at the Solar Iron Works, and that his management of the property was very successful. At the time of the death of Wm. Clark in 1884 his interest was largely overdrawn, and on a settlement of his interest in the firm at its book value, at the time of his death, his estate would only have received $176,690.08 as the net result, after deducting all liabilities.

The master held that the confidential relation between Jane Clark and her son E. L. Clark rendered the agreements of April 2, and April 3, 1888, invalid, and in support of his conclusion cited the following cases : Hunter v. Atkins, 3 Mylne & Keen, 113 ; Tate v. Williamson, L. R. 2 Chanc. App. 55 ; Darlington's Est., 147 Pa. 624 ; 2 Pomeroy's Equity, 486 ; Greenfield's Est., 14 Pa. 489 ; Darlington's App., 86 Pa. 512 ; Miskey's App., 107 Pa. 611 ; Rice v. Davis, 136 Pa. 439 ; Shea's App., 121 Pa. 302 ; Cunningham's App., 122 Pa. 464 ; Neely's Est., 155 Pa. 133 ; Crothers v. Crothers, 149 Pa. 201 ; Worrall's App., 110 Pa. 349; Yeakell v. McAtee, 156 Pa. 600; Jenkins v. Pye, 12 Peters, 252.

The court overruled exceptions to the master's report, KENNEDY, P. J., dissenting.

*Errors assigned* by Elizabeth D. Clark, administratrix, were in dismissing her exceptions to the master's report, and in entering a decree that Jane Clark should account for only a one fifth interest in the partnership assets.

*Errors assigned* by Jane Clark were in overruling exceptions relating to the master's stating the account.

*D. T. Watson* and *P. C. Knox, George C. Wilson, James H. Reed, Johns McCleave* and *J. H. Beal* with them, for Elizabeth

D. Clark.—There was no trust relation between Mrs. Clark and her son: 1 White & Tudor's Leading Cases, p. 148; Ault-man's App., 98 Pa. 505; Allcard v. Skinner, 36 Ch. Div. 168; Cooke v. Lamotte, 15 Beavan, 234; Tate v. Williamson, 2 Chanc. App. L. R. 55; Shea's App., 121 Pa. 302; Darlington's App., 147 Pa. 624; Darlington's App., 86 Pa. 512; Rhodes v. Bate, L. R. 1 Chanc. App. 252.

In contracts or gifts between a parent and child, the child may receive a larger gift, or make a more favorable contract. than an outsider, and notwithstanding the confidential relation between the parent and the child, and the influence of the child over the parent, the presumptions are in favor of the child, and the burden of proof is upon the parent to show fraud: Yeakel v. McAtee, 156 Pa. 600; Worrall's App., 110 Pa. 349; Andries-sen's App., 123 Pa. 303; 1 Daniel's Chancery Practice, 580; Clark v. Everhart, 63 Pa. 347.

If there was a trust relation when the contracts were made, between Jane Clark and E. L. Clark (which we deny) the bur-den is upon Jane Clark to show it; and being shown, she must. also show some unfair advantage, some overreaching on the part of E. L. Clark, though owing to the trust relation (if estab-lished), the degree of proof to establish fraud is less than be-tween parties contracting at arm's length: Hunter v. Atkins,. 10 Eng. Chanc. (3 Mylne & Keen), 112.

*S. Schoyer, Jr.*, and *George Shiras, C. C. Dickey* with them, for Jane Clark.—When a party standing in a relation of trust and confidence to another by whatever name that relation may be called, seeks to assert against the other any contract by which the former receives a benefit, the burden is upon such benefi-ciary to sustain his contract by such proof: Greenfield's Est., 14 Pa. 489; Darlington's App., 86 Pa. 512; Neely's Est., 155. Pa. 133; Shea's App., 121 Pa. 302; Howell v. Ransom, 11. Paige, 538; 1 Story's Eq., 313, 311, 310; Kimberly v. Arms, 129 U. S. 527.

Where the nature of the agency has given the agent control in the management of the principal's property, and peculiar oppor-tunity of knowing its condition and value, a purchase of it by the agent will be avoided at the suit of the principal unless the purchaser make it affirmatively appear that the transaction was.

fair, and that he imparted to the principal all his information concerning the property, and acted throughout uberrima fide: Cook v. Berlin Woolen Mill, 43 Wis. 433; Tooney v. Bank of New Orleans, 1 Walnorth Ch. 649; Pomeroy's Eq. Jur. 958; Spencer's App., 80 Pa. 317; Parshall's App., 65 Pa. 224; Wistar's App., 54 Pa. 60; Diller v. Brubaker, 52 Pa. 498; Coles v. Trecothick, 9 Ves. 234; Sudgen on Vendors, 687; Parsons on Contracts, 87; Story's Equity, 315.

The evidence and findings of the master bring Edward L. Clark within the authorities: Jacox v. Jacox, 40 Mich. 473; Highberger v. Stiffler, 21 Md. 352; Thorn v. Thorn, 51 Mich. 167; Boyd v. La Montagnie, 73 N. Y. 498; Barnes v. Brown, 32 Mich. 146; Garnsey v. Mundy, 24 N. J. Eq. 243; Huguenin v. Baselay, 2 Leading Cases in Equity, 556; 1 Bigelow on Fraud, p. 359; Chronister v. Bushey, 7 W. & S. 152; Sears v. Shafer, 2 N. Y. Ct. of App., 268; Wood v. Downs, 18 Vesey, 120; Gordon v. Gordon, 3 Swanson's Ch. 400; Slocum v. Marshall, 2 Wash. C. C. 397; Smith v. Loafman, 145 Pa. 628; Cunningham's App., 122 Pa. 464; Casborne v. Barsham, 2 Beav. 76; Taylor v. Taylor, 8 How. 183; Boney v. Hollingsworth, 23 Ala. 69.

### ELIZABETH D. CLARK'S APPEAL.

OPINION BY MR. JUSTICE GREEN, March 16, 1896:

The great contention in this case is upon the two agreements of April 2, 1888, and April 3, 1888. They were set aside and annulled by the decree of the learned court below which received the assent of two of the members of the court, the president judge dissenting. The master entertained the same view as the majority of the court and reported a decree striking down the contracts. The conclusion reached by the master and the majority of the court was a conclusion of law, based upon a view of the case which, in their judgment, brought it within the operation of a perfectly sound and wise rule of equity, not at all controverted, and the real question at issue was whether this case belonged to the class of cases to which that rule was applicable. If it does the decision was right and the decree should be affirmed, if not the decision was wrong and the decree should be reversed. The master distinctly finds that, "There is no trace of any actual fraud or misrepresentation in the case,"

and therefore that subject may be dismissed from consideration. The master found that a confidential relation existed between Jane Clark and her son Edward L. Clark, and that he could not take any benefits under the contracts in question without proving affirmatively that the contracts were conscionable and made by Mrs. Jane Clark with a full understanding of their nature and effect and with the aid of independent advice. The rule in its ordinary statement is thus expressed by the master of the rolls in Hoghton v. Hoghton, 15 Beav. 278, who said, " I am of opinion as I lately held in a case of Cook v. Lamotte, that wherever one person obtains by voluntary donation a. large pecuniary benefit from another, the burthen of proving that the transaction is righteous, to use the expression of Lord Eldon in Gibson v. Joyes, falls on the person taking the benefit. But this proof is given if it be shown that the donor knew and understood what it was that he was doing." There are other modes of stating the rule and its usual illustrations are cases of gifts by a donor to a donee, whether by deed, will or other instrument of writing ; if the donee occupies a confidential relation to the donor, and the amount of the gift bears a large proportion to the estate of the donor, the donee must prove that the gift was made intelligently and with a full knowledge by the donor of the true character of the transaction. There are other elements that frequently appear in this class of cases, such as weakness of mind on the part of the donor, undue influence exerted by the donee, misrepresentations to induce the making of the gift and other things of that nature, but they are rather the incidents of the particular cases and have their especial effect. So too there are particular relations of confidence which specially affect particular cases but do not belong to the whole class and are controlled by independent considerations, such as trustee and cestui que trust, guardian and ward, principal and agent, attorney and client. The necessity for caution and discrimination in dealing with any particular case becomes apparent, so that there may be no confusion in the application of the principles to the facts in evidence. Thus in the present case there was no relation of trustee and cestui que trust, guardian and ward, principal and agent, attorney and client, and cases involving those particular relations are not pertinent to the discussion. After a careful consideration of this case we appre-

hend the discussion must turn upon the question whether it was a case of donation, or of a contract with large and unreasonable benefits to Edward L. Clark obtained by means of a confidential relation existing between him and his mother.

So far as the question of gift is concerned we do not see how that element can enter into the case. There is no *gift* of anything in the transaction. The contract of April 2, 1888, purports to be a partnership between Jane Clark and Edward L. Clark in the manufacture and sale of iron and steel at the Solar Iron Works in Pittsburg. It was to be called William Clark's Son & Company and was to continue for the term of five years. The capital is fixed at $380,000, and it consists of the partnership property and effects, including the good will of the partnership theretofore existing between the same parties under the same name. The interest of Jane Clark is declared to be $224,000 and the interest of Edward L. Clark $156,000. Other provisions follow to the effect that Edward L. Clark shall make all contracts and other papers and shall have the full control and management of the business, that he shall have a salary of $5,000 per year, and that the profits shall be divided in the proportion of the respective interests of the partners. There are some other provisions to meet the case of the death of the parties not particularly important to consider at this moment. In this paper there is no gift of anything to Edward L. Clark and there is no provision of any unusual character, especially considering that it was a contract of partnership in a manufacturing enterprise between a woman and a man where the man was to do all the business.

But it is claimed that there was a large increase in the interest of Edward L. Clark in the business in excess of the interest he held in the former firm, and it is very strongly argued that this increase must be treated as a gift from the mother to the son. This only appears by resorting to testimony outside the contract. The undisputed fact appears in the testimony, that Jane Clark and her son Edward L. Clark were partners in the same business from April 1st, 1887, to April 1st, 1888, under a written contract of partnership dated April 1, 1887. It was denied by Jane Clark in her answer to the bill, and in her testimony as a witness, that there ever was any partnership relation existing between them, but the overwhelming weight of the

testimony tc the contrary was such that the master found against her on this subject, and the finding was approved by the court below. They did not believe her testimony on this part of the case and could not possibly have done so, nor do we. In that agreement it was declared that Jane Clark contributed four fifths of the capital and Edward L. Clark one fifth, and it was provided that the profits and losses of the business should be shared in those proportions. The finding of the master in relation to that agreement is as follows: "The master accordingly concludes that the partnership agreement of April 1, 1887, was fairly made, Mrs. Jane Clark receiving full value for such reduction in her capital stock as was made by that agreement." This agreement, it will be observed, does not mention the amount, in dollars and cents, of the interest of each partner in the firm of William Clark's Son & Company. But those amounts were ascertained by the testimony and they were as follows:

| | |
|---|---:|
| . Entire capital stock . . . . . | $380,000 |
| Jane Clark's account . . . . . | 304,000 |
| E. L. Clark's account . . . . . | 76,000 |

In the capital of the firm as it was on April 1, 1887, the interest of Jane Clark was 80 per cent of the whole and the interest of E. L. Clark was 20 per cent. The transfer of $80,000 to the account of E. L. Clark made a corresponding reduction in the amount of Jane Clark's interest, so they stood relatively as follows:

| | |
|---|---:|
| Jane Clark's interest . . . . . | $224,000. |
| E. L. Clark's interest . . . . . | 156,000. |

and that was the position they occupied from and after the agreement of April 2, 1888. Jane Clark's interest being 59 per cent of the whole and E. L. Clark's interest 41 per cent.

Was the transfer of this $80,000 a gift or the result of a fair and conscionable contract? Whatever else it was it was certainly not a gift. In point of fact it was the price paid by Jane Clark to Edward L. Clark to induce him to remain in the firm and to do the other things required of him by the contract of April 2, 1888. It was a consideration moving to him and inducing him to undertake the performance of the terms of the contract. It was fully testified that he had expressed to his

mother his dissatisfaction with the terms of the contract of April 1, 1887, by which he had but a one fifth interest in the concern and yet he was obliged to do, and did do, everything in the way of conducting and managing the business. It was he who made absolutely all the money that was made, and under the contract of April 1, 1887, he was obliged to give his mother four fifths of all the earnings, he getting one fifth only. We do not consider that his demand for a change was in any respect unreasonable, but that it was perfectly fair and conscionable. It must be borne in mind that the relation between E. L. Clark and his mother was a contract relation, and its fair and conscionable character must be considered with reference to that fact. If it possessed those qualities in the abstract as between two partners who were not related to each other, then it possessed those qualities although there was a relationship between the contracting parties. The fact of a relationship would not take away the fairness of the contract if it was fair as between partners who were unrelated. In other words the contract was either fair or unfair as being a contract between persons who were partners, and if as such a contract it was fair and reasonable the added fact of a blood relationship between the parties would not make it unfair or unreasonable. Now as between partners who were strangers in blood we cannot conceive how this contract can be regarded as either unfair or unreasonable in the slightest degree. It would certainly be most unfair and unreasonable as between partners who were strangers in blood, that one of them should give his whole time, attention and service to the work of conducting the business, the other doing nothing, and yet receiving only one fifth of the profits, the whole of which were earned by himself alone. The active partner would certainly be justified in demanding that there should be an important change in such conditions. The result of the change which was agreed upon between these parties was that the interest of E. L. Clark in the firm was increased from $76,000 to $156,000 and the interest of Jane Clark was correspondingly reduced from $304,000 to $224,000, and from the time of the new agreement Jane Clark's interest in the firm was 59 per cent of the whole capital and E. L. Clark's interest was 41 per cent. Would such a change in the interests of the partners if they were strangers in blood be unconscionable? We

think not in any degree.   The inactive partner would still take 59 per cent of the profits, while the active partner who was to earn, and did earn, all the profits was to get but 41 per cent of them.   If this contract of April 2, 1888, was fair as between partners who were strangers in blood, why was it not fair as between partners who were related in blood?   We cannot see unless it is true as a legal proposition that a citizen in dealing by contract with his relatives is bound to give better terms to his relative than to a stranger.   But there is no such rule either of law or morals.   If therefore a given contract between relatives as to a matter in which both are interested, is a fair and conscionable contract intrinsically, it is of that character to all intents and purposes.

Nor do we think the contract of April 3, 1888, between these same parties is of any different character in this respect.   By that contract Jane Clark was to have an assured income from the business of $22,400 per annum without any reference to the results of the business.   It was the substitution of an actual and fixed income in place of an income which might be more, or it might be less, and it might be nothing.   The business from which this fixed income was to be derived was one of much uncertainty and of great risk and hazard.   We said of it in Geddes' Appeal, 80 Pa. on page 442, "There is no class of real property more difficult to dispose of than an undivided interest in an iron furnace.   The iron business is one in which fortunes are sometimes made rapidly, and as suddenly disappear.   It is eminently precarious, subject to frequent and violent fluctuations."

On the hearing before the master the plaintiff offered testimony to show that the contract was fair to Jane Clark in allowing her a fixed income of ten per cent on her proportion of the capital, but the master erroneously, in our judgment, refused to receive such testimony.   But when testimony was taken on the accounting, and the defendant sought to show for what value of the property she should account to the appellant, she was permitted to give, and did give, a considerable amount of evidence in derogation of the value, both of the property and the business.   That testimony is very instructive on the question of the fairness of the contracts of April 2, and 3, 1888, and will justify some reference to it in that connection.

A. W. Painter, a witness for the defendant, was asked: " Q. Wouldn't a plant with that sort of a record rent for more than the legal interest of $400,000? A. I think not, sir. At least it seems so to me; manufacturing business is too hazardous to pay even simple interest on. Q. I am not speaking now of running it yourself but renting it to some one else, would it not have brought more than legal interest? A. Not unless the children of Mrs. Clark would take it; they probably might have been willing to give more, but as I have said I don't think I would. Perhaps I know a little too much about manufacturing business."

I. Z. Speer, another witness for defendant, testified: " The iron business is very risky business and you make money in it for a series of years, and for a number of years after that you make little or nothing. Q. Don't you think that plant could have been rented by the purchaser for at least $18,000 a year? A. As I understand it the ground rent is $8,500 a year and the taxes are about $2,500, that's $11,000, and the $18,000 would make $29,000. Is that correct? Q. That is correct. A. I should doubt it. Q. Do you say in your judgment that it could or could not? A. I don't think it could.

Mr. J. F. Wilcox, another witness for defendant, was asked: Q. Is it your idea that the profits are a recognition of the ability of the management? A. Certainly, sir, most decidedly. Q. And is it not an appurtenance of a plant's success that it is also well managed? A. Most assuredly. Q. So that a purchaser in order to receive the past profits in the future would require equally good management? A. Certainly. . . . Q. Did you know Edward L. Clark? A. I did. Q. Did you regard his personality as having much bearing upon the profits of the concern before his death? A. I did, yes. Q. Edward L. Clark, in the five years preceding his death, had kept the mill up, had he not, to the modern standard? A. Yes, sir." After testifying that Edward L. Clark had spent a great deal of money on the mill after 1888 and had greatly improved its value, he was asked; " Q. Were trade conditions better for the year ending April 1, 1893, than they were on the first of April, 1888? A. I couldn't recall that without looking at the statistics for the year. Q. Well what is your judgment on the subject? A. Well, in 1888 as I remember, things were exceedingly depressed; I

know that my own business suffered a great deal in 1889, and it was better in 1893 generally speaking. Q. Mr. Wilcox, don't you think that a mill that had earned $91,000 or $75,000 a year on an average for five years was worth as an investment for renting to other people, more than the amount of money you have placed as the value of this mill? A. As an investment? Q. To rent it to other people? A. I don't. No, sir. I can give you a sample right here of the Otis Steel Company that made its hundreds of thousands, that was unloaded onto the English, and never made a cent from that time. Q. That is not an answer to my question. To put it specifically you say that a man would have been taking a great risk to have paid over $300,000. Couldn't he on its past record have rented it for more than six per cent on his $300,000, plus the ground rent and taxes? A. I wouldn't say it is impossible, but my judgment is that I wouldn't want to take the risk."

Edwin Miles, also for defendant, was asked, " Q. Would the past profits cut any figure to a manufacturer in determining what he would give for such a plant? A. Not with me in the slightest degree. Q. Why? Give your reason. A. Well a mill might be prosperous for two or three years under the same management and lose all that the next two or three years. If the management could go with the mill there would be a better show that it would continue to make money afterwards. Management is everything. . . . Q. Wouldn't a manufacturing plant like the Solar Iron Works that could have showed five years of large profits rent for more than six per cent on a valuation of $200,000 and the rental and taxes that are charged against it by this lease? A. Mr. Knox, let me answer that question in my own way. If I could have made connection with Mr. Clark which I was at one time very nearly doing and was very sorry I didn't, I would have given almost any reasonable valuation on this property in connection with him because I knew he was doing a profitable business; but after his death the Solar Iron Works would have had no possible inducement. Q. Is that a sentimental reason or is it based on good judgment? A. No. sir; not at all. Based on his good judgment. Q. Then you would have liked to have had an interest in his head, in other words? A. Yes."

William Wade, another of defendant's witnesses, was asked,

" Q. Under the conditions I have named to you, to wit, the location of the plant upon a leasehold such as I have described, what effect would that have upon a purchaser who might desire to buy that plant? A. Well you see you get into conjecture right away. I can only say that the majority of the best manufacturers that I have known wouldn't touch it at all; wouldn't have it. Q. Give your reasons! A. Because it is a fetter on a man all the time; he wouldn't feel like going ahead and spending money when he didn't know what he would get out of it; he has got to calculate all the time everything he can make out of that plant when he buys it. Q. Ordinarily in the course of business would a purchaser of a plant of that kind be governed by the profits the concern had made under another man's management? A. Not if he is a manufacturer himself. . . . Q. Wouldn't that property have had a value even in the spring of 1893 as an investment to have been leased out to some one else to run based upon its past earnings? A. Oh, not at such a period as that; it was a period that nobody was buying, and everybody wanted to sell. . . . Q. Suppose I were to tell you that for the year ending the first of April, 1893, the Solar Iron Works had earned $134,000 on an output of 30,000 tons as against $18,000 on an output of 10,000 tons for the year ending April 1, 1888, would or would it not indicate that this business, at least, had been profitable, and that its plant was worth more at the later period than at first? A. No. Yes, it was worth more as to the cost of the additions, but it is not worth any more except the mere cost of the additions, because those additions are such as most men in the business would feel like putting in. Q. But still it is a better plant? A. Yes, sir. Q. And has a better value to that extent? A. Yes, sir. Q. Wouldn't that affect the plant's value, based on its increased earnings? A. No, for after all the earnings are what your competitors will let you earn. Q. And these profits are dependent upon the management of course? A. Of course. Q. Is it not a possibility and a probability that a purchaser even if he did not desire to operate himself could secure just as good management? A. No. Q. Why not? A. Well if he is to secure it he will have to associate him with him; you can't hire a man. Q. In what way? A. Make a partner of him. Q. He couldn't employ a man to do that? A. No."

The defendant examined her own son, who is adversely interested to the plaintiff, upon this same subject. He was asked: " Q. Wouldn't you assume and wouldn't you feel that you had a good right to assume, and is it not reasonable to assume that a plant that had had the uniform success that the Solar Iron Works had enjoyed, both under the management of your brother and under the management of the previous firm, would continue to earn large profits, and fix your valuation accordingly? A. No; I don't think that follows. Q. Why not? A. Why, because it is getting to be a matter of closer and closer competition all the time, and the man has got to be pretty wide awake now to keep in the lead or keep up with the procession. Q. Aren't the profits that were made by William Clark & Company and William Clark's Sons & Company attributable to the management more than to any other quality? A. I think that is undoubtedly true. Q. And so, when you put so little value on the fact of profits, it is because of the management, the effect the management would have on the business? A. Yes, sir."

The foregoing testimony establishes beyond all question that the entire plant in 1893 was not worth a purchasing price of more than $300,000; that it would not rent for more than $18,000 per year; that the large profits of the preceding five years afforded no guaranty that they would continue during the next five years; that the business was of an exceedingly hazardous and uncertain character liable to large fluctuations, some years large profits and other years none at all; that the ability of a plant to earn profits at all depended upon the skill and business ability of the manager; that a rental of six per cent upon the value of the plant at $300,000 was as much as could be expected in a business point of view as an adequate income to the owner, which would yield to Jane Clark on her three fifths of the capital the sum of $10,800 annually only; that E. L. Clark expended a large sum out of the earnings—proved by other testimony to be $160,000—in the necessary improvement of the plant in order to make it yield any income; that the physical condition of the plant was greatly improved in 1893 over its condition in 1888 when the contracts were made; that the business value of the plant was greatly increased during that period so that Jane Clark's share of the plant in 1893 as fixed by the contracts of 1888 was of greater value than was her share in the old plant

at the proportion of four fifths which she then held. From all which, it necessarily follows that it was her highest and best interest to retain her son Edward L. Clark in the control and management of the business ; that the guaranteed income of ten per cent on her share of the capital was a most liberal income for her to receive, and more than could be expected to be paid by a stranger, and that there was nothing unfair, unreasonable or unconscionable, in the terms of either of the two agreements so far as she was concerned.

A contract of that kind requires no help of explanatory testimony to sustain it. It imposes no burden of proof upon Edward L. Clark's representatives to establish its validity, and if it did, the testimony is to be found in the case in great abundance. It is a great mistake to suppose that where a contract contains these qualities it cannot be enforced because of the absence of technical testimony that it was fully explained to the party affected when it was signed, or that independent advice was obtained regarding it. That rule applies almost, if not quite, exclusively to cases of gifts, and we are not referred to any decisions where it is held to apply to cases of this character, where there was not only no gift of anything from Jane Clark to her son, but where the benefits to be derived were to come entirely from the son by means of services to be rendered in the future by him alone, without any help from her, where she was to be the recipient and he was to be the creator, and where also it was by no means certain that even by the exertion of his utmost efforts, and all the skill and ability which he possessed, any earnings whatever could be realized, and if they were realized it was only as a consequence of his own personal efforts, exertions and business capacity. It seems almost ludicrous to classify such a contract among those voluntary instruments, the essential idea of which is, that one who assumes the attitude of a donor strips himself of a considerable portion of his possessions and transfers them to another who is no better than a mere voluntary donee. That Jane Clark never owned, nor contributed a particle of effort to create, the earnings, which she was to receive from, not to give to, her son, is a patent fact which appears upon the face of the instruments in question, and requires no proof. That this result actually followed, so that in five years she did really receive from her son $112,000 in money, by the

operation and due execution of the contract, on his part, in the creation or production of which money she had no more to do than an unborn child and for which she gave him nothing, is an undisputed fact appearing on the record. It is nothing to the point to say that the money was earned by using property in which she was jointly interested. That property of itself alone produced nothing. It could only be made to yield income by the expenditure of large sums of money of which she contributed not a penny, by the exercise of a high order of business capacity and ability which was personal to her son, and which it was extremely difficult if not impossible to obtain by hiring, and by the constant, incessant and most persistent efforts, exertions and labors of her son. · As a matter of course, such a contract having such results does not possess the faintest shadow of a gift. It is equally unassailable as a contract because there is no evidence on this record to impeach it. All the evidence there is, and the most of it is furnished by the defendant, sustains and supports it. If it be said that Jane Clark ought to have had in good conscience a larger share of the earnings than the contract gave her, where is the evidence to prove it? Nowhere. There is plenty of testimony to disprove such a claim but none to prove it. Why then shall such a contract be stricken down by an arbitrary judicial sentence? It cannot be. There is no reason in law, equity or morals why such a decree should be made.

There is another aspect of the subject that should not be overlooked.

Even if these contracts should be regarded as coming within the operation of the rule which requires explanatory testimony in their support, they are of an exceptional character within that category. While they are contracts between parent and child, the benefits arising from them must be benefits proceeding from the mother to the son, not from the son to the mother. If they have not this character the entire argument for the appellee falls to the ground. But if they have this character they are in entire consistence with the authorities which hold that a child may take a conveyance from the parent without being required to furnish explanatory testimony. It is the parental influence of the parent over the child, and not of the child over the parent, that requires the watchful care of the courts. This was the

case in Miskey's Appeal, 107 Pa. 611, where the conveyance was from the son to his father, and in Worrall's Appeal, 110' Pa. 349, where the grantee stood in loco parentis to the grantor, and it was also the case in Archer v. Hudson, 7 Beav. 551, in Hoghton v. Hoghton, 15 Beav. 278, and in Baker v. Bradley, 2 Sm. & Giff. 531, afterwards on appeal in 7 De G., M. & G. 597. In the latter case Lord Justice TURNER said, " Transactions between parent and child may proceed upon arrangements between them for the settlement of property or of their rights in property in which they are interested. In such cases this court regards the transaction with favor. It does not minutely weigh the considerations on the one side or the other. Even ignorance of rights, if equal on both sides, may not avail to impeach the transaction. On the other hand the transaction may be one of bounty from the child to the parent, soon after the child has attained twenty-one. In such case the court views the transaction with jealousy and anxiously interposes its protection to guard the child from the exercise of parental influence." The same doctrine was asserted and enforced in Savery v. King, 5 H. of L. Cases, 627, Lord CRANWORTH stating in the opinion that where a child receives a valuable consideration there is no presumption of undue influence, and the court does not "inquire whether each party has had a due share of benefit," but where the son under such circumstances without consideration, gives up valuable rights to his father there the presumption arises. The cases of Potts v. Surr, 34 Beav. 543, and Blackie v. Clark, 15 Beav. 595, are other instances in which the same distinction was enforced, and in which relief was refused because the instruments had elements of contract in them and were not pure gifts.

In Bigelow on Fraud, 368, the rule is thus stated: " In the case of a gift from a child to a parent undue influence may be inferred from the relation of the parties, but never where the gift is from the parent to the child."

In Saufly v. Jackson, 16 Tex. 579, the court said, "But the same rule does not apply with the same rigor to all these relations. A settlement made by a parent on a child so far from being regarded with jealousy will always be presumed to be free from suspicion, because it is the natural course for property to take. . . . It is clear that this rule was never applied,

neither unqualified or qualified, to a deed of gift from a parent to a child; and the reverse of such principle has always been sustained, and there is not believed to be a single exception to the principle that a deed from a parent to a child is always regarded with a favorable eye and every presumption is in favor of its validity." Notable cases of a similar character are Millican v. Millican, 24 Tex. 426; Oliphant v. Levorsidge, 142 Ill. 160; Burt v. Quisenberry, 132 Ill. 399; Beauland v. Bradley, 2 Small & Gifford, 339, and there are many others. In Wessell v. Rathjohn, 89 N. C. 377, a father having two daughters executed a deed to one of them, conveying his real property to her without any adequate consideration, at a time when he was in bad health. The deed was sustained. The court said, "The relation of parent and child as to the presumptions of fraud, and the onus of proof to rebut the same in business transactions between them, does not stand upon the same footing as the relation of trustee and cestui, guardian and ward, attorney and client, principal and agent and the higher relations; it belongs to a different class of confidential relations in which the presumption is not so strong, nor does it arise under the same circumstances."

This Court has followed the line of cases on this subject and has proclaimed the same doctrine. Thus in Yeakel v. McAtee, 156 Pa. 600, there was a gift from a mother of 80 years, blind and helpless, to her daughter who had attended her for many years; we held the gifts were valid and that the burden of proving that they were the voluntary and intelligent act of the donor did not rest on the daughter. Our Brother McCollum delivering the opinion, said, "If there is no evidence which tends to show that the donor was incompetent to make the gift, or which raises a suspicion of fraud or undue influence on the part of the donee, the capacity of the donor and the fairness of the transaction will be presumed, unless the relation between the parties is such that the policy of the law casts upon the donee the burden of showing that the gift was the voluntary and intelligent act of the donor. In the absence of such evidence this burden does not rest on the children who receive gifts from their parents. These gifts are, prima facie, good, and it requires something more than the mere relation of parent and child to nullify them, or to impose on the donee the burden of

showing that they are free from any taint of fraud or undue influence: Worrall's Appeal, 110 Pa. 349. It is natural for parents to assist their children, and if they do so by making gifts to them which are, under the circumstances, reasonable, no presumption of incapacity arises."

In the case of Worrall's Appeal, 110 Pa. 349, where the deed was set aside upon the special circumstances of the case, we said, in the opinion, that, " There is nothing in the relation of parent and child or other near relation to preclude one from accepting a benefit from the other in the shape of a gift, or of a contract upon more advantageous terms than would have been granted to a stranger, and that such a gift has been conferred, or contract made, will not warrant an inference that it has been procured by undue influence. Unless there is something suspicious in the circumstances, or the nature and amount of the gift is such that it ought not to have been accepted, even if freely tendered, the donee will not be called upon to show that the transaction was in all respects fair and honest, and in no respect tainted by fraud or undue influence."

It is unnecessary to prolong these citations. In our view these contracts are not of such a nature as to require the help of affirmative explanatory evidence, in order that they may be sustained. If regarded as contracts between partners, as we have already shown, they were fair, reasonable and conscionable contracts and there is nothing in the testimony which would justify a decree setting them aside. As between mother and son the inference is still stronger in their favor. There was no relation of trust between them as to this matter, nor of principal and agent, but if there were, the affirmative proof of fairness in the transaction, and of great benefit to the defendant, completely removes any imputation of unjust advantage or of undue influence. It must not fail to be observed that all the contracts were prepared by the legal adviser of the defendant who also acted for the firm, and it cannot be said, therefore, that there was any absence of legal advice in their preparation. It was also testified by Mr. H. C. Fownes that the terms of the dissolution of the firm were fully discussed for several months before the dissolution took place.

Upon the whole case we do not perceive the presence of the elements which are allowed by the courts to induce them to set

aside important contracts, and we therefore reverse the decree of the learned court below and state the account upon the basis of the validity of the contracts in question. The testimony and the findings of fact by the master furnish us the data from which a final decree can be made by this court. On the 31st of March, 1887, what is spoken of as the book value of the Solar Iron Works was made up of two principal items, the value of the physical plant and the value of the accounts and bills receivable. The latter are set down as having a net value of $141,000. E. L. Clark's share of this under his contract would be 41 per cent or $57,510. The profits made after March 31, 1887, and up to March 31, 1893, are shown to be $473,170.43. The estimated profits from March 31 to April 25, 1893, are $7,500, making the total profits made during the period $480,670.43. After taking from this sum all deductions and withdrawals made by the parties, including the cost of the improvements made by E. L. Clark, his share of the remainder would be $123,883.75.

The value of the plant was fixed by the master at the sum of $500,000 when the defendant took possession and elected to treat herself as the purchaser. The interest of E. L. Clark at 41 per cent was $205,000. Adding these sums we arrive at the amount due the plaintiff thus:

| | | |
|---|---:|---:|
| Interest in the accounts on March 31, 1887 . | $ 57,810 | 00 |
| Share in the profits made after March 31, 1887 . | 123,883 | 75 |
| Interest in the plant April 25, 1893 . . | 205,000 | 00 |
| Total . . . . . | $386,693 | 75 |
| Upon this sum interest should be computed from April 25, 1893, to the 16th day of March, 1896, the date of this calculation—two years, ten months and twenty days . . . . | 67,053 | 57 |
| Total . . . . . | $453,757 | 32 |

Now March 16, 1896, the decree of the court below is reversed, the contracts of April 2 and 3, 1888, are sustained and the accounts are adjusted upon that basis, and it is now ordered, adjudged and decreed that the defendant, Jane Clark, do pay to the plaintiff, Elizabeth D. Clark, administratrix of the estate of Edward L. Clark, deceased, the sum of $453,757.32, with costs of suit.

APPEAL NO. 261, OF JANE CLARK, THE DEFENDANT.

OPINION BY MR. JUSTICE GREEN:

We are satisfied with the master's rulings as to the value of the plant and are not convinced that there is any error in the matters complained of in the several assignments of error on the part of the defendant. The principal subject of contention between these parties has been disposed of in the opinion and decree filed in the case of the plaintiff's appeal, No. 255, October Term, 1895. Supra p. 309.

The assignments of error are overruled and appeal dismissed at the cost of the appellant.