ROLLIN D. JACOX v. ALLEN B. JACOX AND MARY JACOX.

*Equitable wardship—Mental unsoundness.*

An equitable wardship arises where a son takes charge of his father's affairs in the belief that the latter is incompetent to manage them, and the father passively submits.

The conduct of relations and others towards an individual is better evidence of what they think of his mental soundness than any term they can use to express it, especially when, without being experts, they recognize in him a condition of mental disorder without thinking it amounts to insanity.

If a person, by reason of having "the blues," is considered unfit to attend to his business, and passively surrenders it to the control of others, his condition justifies equitable investigation into the justice of any bargain which those who have charge of his affairs may have made with him.

40 MICH.—60.

A presumption arises against the justice of any bargain made by one in the position of a guardian with a ward incompetent to manage his affairs, and the guardian has the burden of showing that the transaction was fair and for the other's interest.

Appeal from Kent. Submitted Jan. 24. Decided April 9.

BILL to set aside a deed. Defendants appeal.

*H. E. Thompson* for complainant.

*Taggart & Wolcott* for defendants.   One who seeks to set aside his deed on the ground that it was obtained from him by fraud while he was insane, must show that his mental capacity was insufficient for the proper execution of the deed, *Jackson v. King*, 4 Cow., 207; *Lozear v. Shields*, 23 N. J. Eq., 509; *Person v. Warren*, 14 Barb., 488; *Odell v. Buck*, 21 Wend., 142; *Sprague v. Duel*, 11 Paige, 480.   The best rule to guide the court in determining whether a person is thought to be insane is the conduct of others towards him.   Beck's Med. Juris., § 878.

GRAVES, J.   During the summer and fall of 1872 the complainant was the owner of an eighty-acre farm in Kent county.   He was a little more than fifty years of age, and was living on this farm with a second wife whom he had married the preceding February.   He had two children: the defendant Allen B. Jacox, husband of defendant Mary, and a daughter, Eveline Buck, wife of Eli S. Buck.   They were in comfortable circumstances and lived near by.   The mutual relations of all the parties were pleasant so far as appears.

Complainant's farm was worth about $2,500, and he owned personal property of the value of about $600. His wife had voluntarily advanced to him $150, for which he had given her his note, and he was indebted to others for between twenty and thirty dollars.   So far as shown, there were no other liabilities except for the year's taxes.

Prior to the season mentioned his health had been generally good and his disposition of a cheerful turn. His habits had been industrious, and in regard to the state of his property, his course had been somewhat precise and cautious, and it seems to have been a noticeable trait of his character to be more anxious than most men as to the possibility of future loss and destitution. No one questioned his ability to manage his affairs.

There was no change until the latter part of the summer of 1872. A drouth came on which somewhat affected crops and rendered appearances less promising than they had been, and about the same time a change in complainant's deportment and conduct was observed. It was discovered by his neighbors, and became the subject of talk among them. The epithet employed was that he had the "blues." His usual cheerfulness had left him, and his work was not conducted and attended to as it had been. He became moody and despondent, and fancied he was coming to want and would not be able to take care of himself. At the same time he seems to have embraced the notion that his wife had funds to aid him and declined to let him have them. According to the case there was no rational basis in the state of his affairs or in his wife's possessions or disposition for any of these feelings or apprehensions.

The proof identifies instances of strange behavior, but most of the witnesses who testify to complainant's change speak generally of his condition, and apparently for want of any term more expressive of their idea of his real state, they observe that he had the "blues," or that he had the "blues terrible bad." And here the remark is suggested that the actual conduct of relatives and others at the time in question towards the individual is generally of much greater value as proof of their conception of his mind or capacity than any term they may employ on the stand to express it. This observation is especially applicable to cases where those

who are not experts recognize the presence of mental disorder, but do not recognize in such condition a present state of complete insanity. That there is disorder more or less positive and controlling is perceived and admitted, but it is not apprehended as sufficient to constitute complete insanity.

The condition of unsoundness thus distinguished by common observers is recognized as adequate to justify equitable investigation. It is not required that it should come from medical experts that the person was insane, or from those not experts that in their view he was crazy.

In case it appears from the facts that there was mental disorder, but not of a high degree or far advanced, it then becomes material to inquire into the nature of the transaction and the influences leading to it. And if the circumstances disclose that the person under the infirmity, whether through choice, accident or otherwise, was as matter of fact for the time being in the place of ward of the other party, or was by his own consent, however brought about, in a state of submission to the judgment or opinion of the other, a presumption will arise adverse to the justice and equity of the bargain, and the bargainee will be required to show that no advantage was taken and that in itself the arrangement was not only suitable, fair and conscientious, but one expedient under the circumstances and conducive to the interests of the other.

Passing from these general considerations to the record and pursuing the case, we find that in the latter part of December, 1872, and while this abnormal condition of complainant remained without any substantial change, his wife informed Mr. Buck, the son-in-law, that she had decided to separate from her husband, and, in her language, that she "could not stand it with him any longer," and "had got to leave him." She spoke of the strangeness of his behavior, and explained some instances.

It was then arranged that Buck should at once make the impending separation known to the defendant Allen, and he accordingly called upon him in the evening and informed him.

On that occasion complainant's situation and dependence were talked about between the son and son-in-law, and they mutually agreed that in view of the separation it would be immediately necessary for one of them to take care of complainant and of his property.

Their versions differ as to the expressions which were used, Buck swearing that complainant was spoken of as not being right in his mind and as being "crazy," and the defendant Allen swearing that he does not recollect that any thing was said about complainant's being of unsound mind or insane. The circumstance is not important. Their acts are full of meaning, and they concur to show that unity of opinion existed regarding complainant's want of capacity and his inability to manage for himself.

Without consulting him they at once entered into an understanding that he should be taken and cared for by one of them and that such one should have all his property, and the only thing left to his option was to choose which of the two he would live with. The next morning they went together to complainant's, and then told him that his wife had decided to leave him and was about doing so. He then inquired what he should do, or what they were going to do with him, and Buck, bearing in mind the understanding of the previous evening, stated in reply that himself or Allen would have to take care of him, and that he might choose between them. He apparently regarded this as decisive, and very shortly intimated that he would go with his son. The young men assisted complainant's wife in packing up preparatory to her separation, and she then went to Buck's and defendant Allen took complainant to his place.

A few days later the defendant Allen procured a deed from his father to himself of the farm and also a trans-

fer of all the personal property. Complainant's wife joined in the deed. The property was worth $3,100. In connection with this, the defendant Allen voluntarily gave to complainant's wife the sum of $100, and also assumed his father's debt to her of $150 and the other items of debt of less than $30, and conveyed to his father an estate for the life of the latter in the farm he, Allen, then held. This place was worth from $2,000 to $2,250, and was encumbered by mortgage for a little more than $1,000. The actual cash value of the life estate was hence very small. Considering the age of complainant it would not have exceeded $1,200 if the place had been unencumbered. But the mortgage upon it did more than affect the amount of capital in the land. It rendered the estate liable to be cut off by foreclosure. The reduction of the mortgage subsequently is not important. There were no other payments, assumptions or gratuities.

The defendant Allen claims that it was part of the arrangement that he should take care of and support his father during life, and that the conveyance of the life estate was made to secure the promised support and as consideration for the property received. But the writings given make no allusion to this, and there was no written undertaking whatever to bind Allen to provide the support, and there are indications in the record that he does not consider himself under legal obligation to make such provision.

Complainant staid with his son until the fore part of October or about nine months, when he fell and was injured. He was then taken to the home of his son-in-law Buck for the more convenient application of a remedy the latter had, and thereafter continued at Buck's. On recovering from his injury he refused to return, and Allen refused to pay anything for his support at Buck's or elsewhere abroad, and about the same time caused the farm received from his father to be conveyed to his wife, the defendant Mary, without consideration.

After some fruitless efforts to effect a pacific adjust-

ment, complainant filed this bill to procure a cancellation of the transactions on the ground that he was laboring at the time under unsoundness of mind, and that his son took advantage of his situation and defrauded him. The circuit court decreed in complainant's favor and the case comes here on appeal by defendants.

This exhibition of the case in outline affords a better explanation than any discussion would give, of the true condition of complainant and of the real nature of the transaction called in question.

We notice his situation in regard to property and see that there was nothing in that to cause him disquietude. He was in a state of substantial independence, and neither age nor any apparent ailment of a merely physical nature suggested retirement from the activities of life or any surrender of his property or personal independence. He was a few years only past middle age, and was strong and capable of labor.

But there is another aspect. His wife and a portion of his neighbors noticed a marked change in his manner and conduct. They could not say he was "crazy," but they were sure he had become gloomy and despondent, and his wife found out that she could not rely upon him as formerly; that he was vacillating and incapable of any steady purpose or labor, and in deep fear of coming to want and destitution, and inclined to do things which were unreasonable, if not more serious in their indications.

His son-in-law Buck and his son, the defendant Allen, recognized that his mind was out of order and were convinced that he was no longer competent to have the care of himself or of his property, and they acted towards him upon this assumption and theory. No other explanation of their course is now credible. He accepted the sudden breaking up of his home as if it were a decree of fate, and passively complied with the pre-arranged plan of his son and son-in-law for the wardship of his person and the control of his possessions. There was no struggle,—no resistance. He did not dispose of himself, but

in a listless way came to be governed by his son. In this state of supineness, of docility, and of indifference to events of the greatest importance to him, we have very strong evidence that his wife and children were not in error in supposing that his mind was considerably disordered. And when we survey all the circumstances, including the disposition made of property, the fact itself seems to be established. The case permits no other hypothesis.

Complainant's son received him as one not qualified to take care of himself, and the circumstances created an equitable wardship. It was a case of high and sacred trust and confidence, and the situation imposed a solemn obligation on the son to guard the rights and interests of the father as far as practicable against infringement or detriment and to abstain scrupulously from attempting to drive any bargain of profit or advantage with him. This obligation—this duty—was not observed. On the contrary, advantage was taken of the relation and of complainant's condition to deprive him of a large share of his little property and to reduce him measurably to a state of personal dependence. And the transaction was so repugnant to the duty which was due from the defendant, and so manifestly unconscionable as to need no special discussion to expose its demerit. It is said on the part of the defendants that Buck has incited this contention. We do not see how that helps the defense. If he participated in the proceedings to dispossess complainant, and now, either with good or bad motives, espouses his case, it cannot relieve the transaction of its taint of injustice and inequity, nor deprive complainant of his right to come into court for redress.

The state of facts forbids all hesitation concerning the result. There is no pretense that defendant Mary is in any better position than her husband, and we think the decree should be affirmed with costs.

The other Justices concurred.