CANDACE SANDS

*v.*

MARCUS SANDS.

*Filed at Ottawa January 22, 1885.*

1. WITNESS—*credibility—undutiful son, as against the mother.* In a contest between an aged and infirm mother and her son, respecting her property, in which he sought to acquire her title to all the property she had, by taking advantage of her affection and confidence, and then deny her a support, and where the proof showed he had used opprobrious language towards her, it was *held*, that, from his selfish disposition and want of filial regard, the court could not place much confidence in the testimony of the son in a contest of such character.

2. MISTAKE OF LAW—*when relieved against.* Although the rule is, that a court of equity will not ordinarily relieve a party against a mistake as to the law, still, where such mistake is induced by a party taking advantage of it, and the relations are such that the party deceived is dependent upon the party deceiving, or is otherwise peculiarly under his influence, a court of equity will interfere, and protect against any advantage thus obtained.

3. In this case, a favorite son, taking advantage of his mother's affection, induced her to make a conveyance of all her estate to him, upon the assurance of the son that the deed was in the nature of a will, and would not take

15—112 ILL.

effect in her lifetime. The mother was, at the time, of the age of seventy-three years, and greatly weakened in body and mind from disease and sickness, so as to be incapable of transacting business, and the proof showed the deed was not intended by her to have effect before her death, but was handed to the son to be placed with her papers, and upon her recovery she destroyed the deed. It was *held*, that the trial court erred in decreeing that the mother execute another deed in place of the one she had destroyed, and in dismissing her cross-bill to have the conveyance made set aside.

4. SETTING ASIDE DEED *procured by undue influence.* Where a person enfeebled in mind by disease or old age, is so placed as to be likely to be subjected to the influence of another, and makes a voluntary disposition of property in favor of that person, the courts will require proof of the fact that the donor understood the nature of the act, and that it was not done through the influence of the donee. Such a conveyance is presumptively void.

5. SPECIFIC PERFORMANCE—*repudiation of contract.* It is only when the evidence is clear and precise, that a court of equity will decree a specific performance; and when a party has repudiated a contract by denying the other party his rights under the same, he can not enforce its specific performance.

6. DEED—*grantor's control over it until it takes effect.* A mother was induced by her son, while she was in a feeble state of mind, to execute a deed to him for her land, including her homestead, under the assurance and belief that it would not take effect until recorded, and the grantee agreed not to procure the same to be recorded during the life of the grantor: *Held*, the deed would not take effect as to the grantee, and the grantor might destroy the same at pleasure.

APPEAL from the Circuit Court of Whiteside county; the Hon. JOHN V. EUSTACE, Judge, presiding.

This was a bill in equity, in the Whiteside circuit court, by Marcus Sands, against Candace Sands, praying that she be decreed to reëxecute a deed for a certain forty-acre tract of land, and for general relief.

The material allegations in the bill are, that on the third day of June, 1881, the defendant, for a good and valuable consideration, deeded a forty-acre tract of land, which is particularly described, to the complainant; that he took possession of the land under the deed, and made valuable and permanent improvements thereon; that she afterwards, without his

knowledge or consent, got possession of the deed before it was recorded, and destroyed it, and that she has refused to execute another deed, although requested so to do.

The defendant answered, denying the delivery of the deed as alleged. She admits the execution of the deed, but alleges that she was at the time dangerously sick, and her mental faculties and will power affected and impaired by sickness; that complainant, who is her son, by fraud and undue influence induced her to sign the deed; that he induced her to believe, and she did believe, that such deed would not be treated as delivered and valid if she got well, but would remain under her power and control, just like a will, subject to revocation or alteration, if she should so elect. She also sets up and claims a homestead in the tract.

Replication was filed to the answer, and the defendant then filed her cross-bill. The cross-bill alleges, as does the answer, the age, sickness, and consequent weakness of will and intellect of the defendant at the time of the execution of the deed; that complainant, who is her son, induced her, by false and fraudulent representations, to sign it; that her husband, who was then alive, and living with her, did not join in its execution, and knew nothing in regard to it; that she was induced by the complainant, and the notary public acting under the complainant, to believe, and did believe, that if she recovered from her sickness the deed would be invalid as a conveyance, and of no more effect than a will; that she never delivered it intending that it should take effect as a deed, but simply handed it to the complainant to be placed among her other papers, where she could control it. She also sets up and claims estate of homestead in the property. She alleges that complainant is in possession, and refuses to account for rents and profits, prays that the deed be set aside and removed as a cloud upon her title, and that an account may be taken of rents and profits, and complainant decreed to pay the amount so to be found due. Answer was

filed putting in issue these allegations, to which there was a replication.

Evidence was given on behalf of complainant and defendant, on the issues thus presented, and the court, on final hearing, decreed that defendant, within thirty days, make, execute and deliver to the complainant a good and sufficient deed for said land, conveying to him all right, title and interest which the defendant had in the land on June 3, 1881, "excepting such rights as the defendant may then have had in said land under the laws of the State of Illinois, entitled 'Exemptions and Homesteads.'"

The errors assigned properly bring before the court the questions discussed in the opinion.

Messrs. BENNETT & GREEN, for the appellant.

Messrs. C. J. & C. C. JOHNSON, for the appellee.

Mr. CHIEF JUSTICE SCHOLFIELD delivered the opinion of the Court:

John P. Sands, and Candace, his wife, lived on a farm of one hundred and twenty-six acres, in Whiteside county, the title whereof was in him, from some time in the year 1847, and raised thereon a family of eight children, of whom five survived their father. The farm was opened and improved and cultivated, as we infer from the evidence, by the joint labor of all, each contributing, as is usual in such cases, to the extent of his or her ability, in his or her own way. As the children, respectively, attained their majority, they left home, and thereafter conducted business for themselves. Before the year 1873 they had all left home, the father and mother remaining alone upon the farm. Marcus, the youngest child, had learned the carpenter's trade, and after having had employment at different places, late in the year 1873 was induced

by his father and mother to return and live with them on
the farm, and work it for a share in the products. In 1874
he was married, and then removed into and dwelt in a house
some fifteen rods distant from that occupied by his father
and mother, but on the same forty-acre tract of land, and
thenceforth he continued to work the farm, as before, for a
share in the products. Early in the year 1881, John P.
Sands conveyed, through Marcus, to Candace, the forty acres
whereon were the houses occupied as dwellings, and which is
the tract affected by this controversy. Candace made her
will, whether before or after she received this title is not very
clear from the evidence, intending thereby to devise this tract
to Lelia, the wife of Marcus. About the middle of May, 1881,
Candace became sick, and remained sick until in July follow-
ing. While she was thus sick (on the 3d day of June,) she
executed the deed, reëxecution of which is now sought to
be coerced, and some time afterwards, probably during the
same summer, she destroyed this deed. John P. Sands de-
vised the remaining eighty-six acres of the farm to Marcus,
by his last will, and died on the 11th day of June, 1883.
Marcus has paid no rent, and rendered no account to Can-
dace, at any time. Prior to the death of John P., Marcus
accounted to him, and paid rent for the entire farm. Thus
far there is no substantial dispute as to the facts; nor is it
disputed that when this deed was executed, Candace owned
no other property, that no one was present at the execution
of the deed save Marcus and the notary taking the acknowl-
edgment, and that no one else, save the wife of Marcus, had
knowledge thereof, although, at the time, John P., and an
aunt of Marcus, and a servant girl, were all in an adjoining
room.

The deed was executed at the instance of Marcus. His
wife, at his instigation, informed Candace that the will was
not satisfactory. They were afraid the will might be broken
by the other heirs, and it was preferred the title should be

in Marcus, instead of his wife. At the time the deed was executed, Candace was in her seventy-third year of age, and, beyond all question, quite sick. We think it evident, from the testimony, that apprehension of approaching dissolution was the cause of the execution of the deed at that time. No one had previously spoken to Candace upon the subject of executing the deed, but Marcus and his wife. He took the old deed to the notary, had a deed from her to himself drawn, brought the notary to the house, had him introduced to her presence, and the deed signed by her and acknowledged before the notary, without the knowledge of the other inmates of the house. No opportunity of consultation or advice was allowed or offered. That Candace did not ask or seek such advice only proves how completely she was under the control of Marcus. Here she was, according to his version, absolutely giving away everything that she had, at an age when she could no longer earn a support, and her husband, her natural adviser and protector, only a few feet distant, kept in profound ignorance of what she was doing.

The physician who attended upon Candace says that she had hysteria, and that there were periods during her sickness when she was incapable of transacting business. Other witnesses testify, that in their opinion she was insane on the third of June, and incapable of acting rationally in business matters. It is shown that about that time she made several attempts to commit suicide, was easily provoked to tears, and was very nervous and excitable. The evidence shows, beyond question, that age and disease had affected her mind to some extent, weakened her will power, and impaired her judgment; and so, at all events, it is, in our opinion, quite clear that she was in a condition to receive, without question, almost any representation as true, if made by one who had her confidence, as Marcus had, and incapable of judging and determining its legal accuracy. She testifies that both Marcus and the notary informed her the deed would be worth-

less,—"of no more value than a piece of brown paper," if she got well; that it could not take effect until recorded, which he promised should not be done while she lived, and that she never delivered it to take effect then as a deed, but that she simply delivered it to Marcus with the request that he would place it among her other papers. It is true he does not admit this, but says the delivery was absolute. He does, however, admit that she requested him not to have it recorded then, nor until after her death, and there is other evidence proving that she had been made to believe that it would not take effect until it was recorded.

An examination of the evidence of Marcus fails to impress us favorably in his behalf. This record shows that he admits that he had called his mother a liar, and, from the evidence, he shows a disposition to deny her all means of support, at a time of life when she is no longer able to help herself. He is made to appear willing to take advantage of her affection and weakness in order that he may plunder her of what she has, and then leave her to the charity of the law to obtain a support where it may enforce it, for the evidence shows that he has refused to account to her for rents and profits, and that he said to her that if any one must leave the land, it would be her. Much confidence ought not to be, and can not be, placed in the evidence of one thus shown to be so selfish, and so devoid of filial affection and respect, where the direct effect of his evidence is to give him property, or take it from him. With such, the distinctions between right and wrong are not well defined and marked, and the love of truth, as a mere matter of sentiment, is not apt to control in such minds.

Although the general principle is, a court of equity will not, ordinarily, relieve against a mere mistake as to the law, still where the mistake is induced by a party taking advantage of it, and the relations are such that the party deceived is dependent upon the party deceiving, or is otherwise peculiarly

under his influence, a court of equity will interfere, and protect against any advantage thus obtained. Bispham's Principles of Equity, (2d ed.) sec. 188; Kerr on Fraud and Mistake, (Bump's ed.) 400; *Wheeler* v. *Smith,* 9 How. 55.

The mere relations and situations of these parties condemn this transaction. It can not be tolerated that a mother, whose mind is weakened by age and disease, shall be overreached through her affection for a favorite child, and thereby pauperized, and made a charge upon the public or a burthen upon her other children, so long as the rights of third parties are not affected. Parties thus related occupy unequal positions. Naturally, and it may be unconsciously, such a son will have an undue influence over such a mother. The rule is, where a person enfeebled in mind, by disease or old age, is so placed as to be likely to be subjected to the influence of another, and makes a voluntary disposition of property in favor of that person, the courts require proof of the fact that the donor understood the nature of the act, and that it was not done through the influence of the donee. *Haydock* v. *Haydock,* 7 Stew. (N. J. Eq.) 570; *Huguenin* v. *Baseley,* 2 L. C. in Eq. (4th Am. ed.) notes, 1183–1185; Am. notes, 1192–1194; Bispham's Principles of Equity, page 296, sec. 235. And so where a son, believing that his father, who had the "blues," was incompetent to manage his own affairs, took charge of them, the father passively submitting, and the son also induced the father to execute to him a deed of his farm, and to transfer all his personal property to him, it was held that the transaction was presumptively void, and it was incumbent on the son to show conclusive good faith. *Jacox* v. *Jacox,* 40 Mich. 473.

There is some pretense, here, that the conveyance was for a valuable consideration,—the leaving off, by Marcus, of working at his trade, and his coming upon the farm and working it. The evidence before us does not so clearly and precisely

prove such a contract that we can say it should be specifically enforced, and it is only when the evidence in such cases is clear and precise, that a court of equity will decree specific performance.   But if such a contract was made, it is clear, beyond dispute, that it contemplated the use of the land, or rent of that part not personally occupied and used by Candace, during her lifetime, and Marcus has repudiated the contract by denying her rights, and neglecting to pay her rent. This court held in *Frazier* v. *Miller*, 16 Ill. 48, that such subsequent denial of the rights of the grantor, under a similar contract, would justify its rescission by a court of equity. The same doctrine was re-announced in *Oard* v. *Oard*, 59 Ill. 46, and it was there said that if the rescission of the contract in cases of such character could not be referred to any other head of equity jurisdiction, it would be proper to presume that it was, in the first instance, made with a fraudulent intent. *Jones* v. *Neely*, 72 Ill. 449, recognizes the same doctrine.

Candace Sands, according to the clear preponderance of this evidence, never intended to invest a present title, and did no act which she intended as an absolute delivery of the deed.   She was induced by Marcus and the notary to believe, and did believe, the deed would not take effect until recorded, and as to him, therefore, it must be held it did not take effect, and might be destroyed at her pleasure.

We think the court should have denied relief on the original bill, and granted relief on the cross-bill, and for the error in that regard the decree below is reversed, and the cause remanded, with directions to the court below to now so decree.

*Decree reversed.*