J. W. STRINGFELLOW, Special Administrator, Substituted for JOHN PETER JOHNSON, Deceased, Respondent, v. EMMA HANSON, Appellant.

No. 1366. (71 Pac. 1052.)

1. **Deeds: Setting Aside: Fraud: Undue Influence: Failure of Consideration: Motion For New Trial.**

In an action to set aside a conveyance from plaintiff to defendant, his daughter, for undue influence, want of consideration, and false representations that it was not to be effective until after the grantor's death, and that the property was to be his as long as he lived, a decree was entered directing that the deed be cancelled and set aside. Defendant moved for a new trial for newly-discovered evidence, which consisted of a lease of the land from her to plaintiff for his life, executed and delivered to him at the time he deeded to her. *Held,* that the motion was properly overruled, for, while the lease would overcome any inference of fraud or deceit on defendant's part in representing that the deed would not be effective until after plaintiff's death, and that the

property should be his as long as he lived, it did not overcome evidence showing failure or inadequacy of consideration.

## 2. Same: Senile Debility.
It does not follow that because the mind of a party is weakened by trouble and old age, and his judgment thereby impaired, he is mentally incapacitated from executing a deed.[1]

## 3. Same: Capacity to Execute Deed: Test.
The test of a party's capacity to execute a deed is whether he had at the time sufficient reason and mental capacity to understand the nature of the contract he was entering into, and to realize and appreciate the probable results of the transaction.

## 4. Same: Facts Considered: Competency of Grantor Shown.
In an action to set aside a deed on the ground that the grantor was mentally unbalanced at the time of its execution, it was shown that prior to the death of his wife he was a strong, healthy man, seventy-three years of age, in every respect capable of managing his own business; that thereafter he appeared to grow weaker in body and mind; that his memory was affected; that he was at times absent-minded and forgetful in business matters, but that these changes in his demeanor, conduct, and actions were not observable to any great extent until long after the deed was executed. Several disinterested witnesses testified that he impressed them as being mentally sound; that "he had common sense;" that they "couldn't find anything wrong with him." *Held,* that he was competent to legally dispose of his property at the time the deed was executed.

## 5. Same: Facts Considered: Undue Influence Not Shown.
In an action to set aside a conveyance from plaintiff to defendant, his daughter, for undue influence, there was evidence that defendant had stated that she had received a revelation from her deceased mother, expressing a wish that plaintiff deed the land to defendant, and that defendant had communicated the alleged spiritual manifestation to plaintiff. Plaintiff testified that defendant had several times spoken to him about having had the revelation, but he did not state that because of it he was influenced or induced to make the deed. On the contrary he repeatedly reiterated that he deeded the land to defendant because of his wife's wish, expressed before her death, that he should do so, and because defendant had been kind to them, and had taken care of the wife during the latter's sickness. *Held,* not to show undue influence.

[1]Chadd v. Moser, 25 Utah 369; 71 Pac. 870.

25 Utah—31

6. **Same: Facts Considered: Valuable Consideration Shown.**

In an action to set aside a conveyance by plaintiff to defendant, his daughter, as without consideration, the evidence showed that defendant's conduct towards her parents was such as would naturally tend to inspire their love and gratitude; that for two years she constantly cared for and waited on her invalid and helpless mother, after whose death defendant continued to care for, comfort, and administer to the wants of plaintiff; and that in pursuance thereof, and of his wife's wish, made known to him before her death, as shown by his own testimony, plaintiff executed the deed in question. *Held* to show a valuable and meritorious consideration.[2]

7. **Same: Parol Evidence to Show Consideration.**

In an action by a grantor to set aside a conveyance as without sufficient consideration, the grantee is not confined to the consideration expressed in the deed, but may, where the rights of creditors are not involved, show the entire consideration.

8. **Same: Facts Considered: Failure of Consideration Shown.**

In an action to set aside a conveyance by plaintiff to his daughter, as without consideration, it appeared that the land was worth about $2,000, and that defendant had agreed to pay, but had not yet paid, a consideration of $500 therefor; that for several years she had taken care of, waited on, and administered to the comfort of plaintiff, who was old, weak, and an invalid; that she had had the use of the land and a dwelling thereon; that she had received from him and collected for him money amounting to $1,400, and had made no accounting for it; and that in consideration of love and affection, and in recognition of her services, plaintiff had already deeded her another tract of land. *Held*, that there was a failure of consideration and that the conveyance should be set aside. BARTCH, J., dissenting in part.

(Decided April 4, 1903.)

Appeal from the Third District Court, Salt Lake County.— *Hon. W. C. Hall,* Judge.

---

[2] Brinton v. Van Cott, 8 Utah 480; 33 Pac. 218.

Stringfellow v. Hanson.

Action to set aside certain conveyances of real estate made by deceased during his lifetime to the defendant. The opinion states the facts. From a decree in favor of the plaintiff, the defendant appealed.

MODIFIED.

*J. E. Frick, Esq.,* and *Messrs. Stewart & Stewart* for appellant.

*Messrs. Wilson & Smith* for respondent.

Where the relation between the parties is such that one party would naturally exercise influence over the conduct of the other, a court of equity will interfere to set aside the instrument. A conveyance obtained by children from their father will not be sanctioned by a court of equity if it appears to have been caused by an abuse of confidence reposed by him in his children to take advantage of his age, imbecility, and partiality for them; the conveyance being also for an inadequate consideration. 2 Rice on Evidence, 1084, 1088, 1089.

So if a party is of weak mind and no adequate consideration is shown, undue influence will be presumed. Allore v. Jewel, 94 U. S. 506, 511; Griffiths v. Gody, 113 U. S. 133; 2 Pomeroy, E. J., 928, 947, 951, 956; Jacox v. Jacox, 40 Mich. 473; Thorn v. Thorn, 51 Mich. 167; Odell v. Moss, 62 Pac. (Cal.) 555; Hiberger v. Siffler, 21 Md. 352; Sprager v. Hall, 62 Iowa 498; 2 Pomeroy, Eq. Jur., 947, 951, 956; 1 Bigelow on Frauds, 359; Sands v. Sands, 112 Ill. 226; Oard v. Oard, 59 Ill. 46; Frazer v. Miller, 16 Ill. 48; Simpler v. Lard, 28 Ga. 52; Hamreck v. State, 134 Ind. 325; Ward v. Ward, 57 N. E. (Ohio) 1095.

McCARTY, J.—It appears from the record that plaintiff John Peter Johnson and Emma Hanson, defendant, were father and daughter; that they were foreigners (Scandinavians); that Johnson came to this country in 1866, and his daughter, Emma Hanson, in 1875, and both lived in Salt Lake county, Utah, until the death of the former, which occurred since the trial of this case; that Emma Hanson, after she came to this country, with the exception of a few years, lived with her parents up to the time of the death of her mother in 1891; that for the two years next preceding her mother's death she lived with, assisted, and attended to her mother, who was sick and unable to care for herself, and who during the last six months of her illness was paralyzed, and was cared for at Emma's home. Johnson had eleven children, but all had left him long before the death of his wife, except Emma, who remained with and took care of him until July 17, 1900, when he was taken away and removed to the home of one of his other children. Johnson at the time of the death of his wife was seventy-three years of age, and prior thereto had been strong and healthy, and in every respect able and competent to attend to and manage his own business affairs. On the 19th day of June, 1892, Johnson executed and delivered to Emma a deed of conveyance to the five acres of land described in the plaintiff's first cause of action. The consideration expressed in the deed was $50, which was paid by Emma to her father at the time the deed was signed. The instrument was recorded within six months after it was executed and delivered. On April 20, 1895, Johnson deeded to Emma the ten acres of land described in his second cause of action, Emma at the time agreeing to pay $300, after her father's death, to some old lady who had advanced or loaned some money to members of Johnson's family with which to pay their transportation from the old country to this; and it was further understood that Emma should keep, care for, and furnish her father a home during

the remainder of his life, and at his death to pay $200 to. defray his funeral expenses. Soon after 'the death of John-. son's wife there appeared to be a change in his condition,. mentally and physically; that is, he appeared to gradually grow weaker in body and mind—caused no doubt, to some extent, by the loss of his wife, but mainly due to senile debility. During the year 1896 he had a severe spell of sickness, and from that time on he rapidly grew weaker and more feeble.. The last few years he lived with Emma he was confined to his bed, and was unable to care for himself or to be left alone,. and Emma gave him constant care and attention. When she. was called away from home she would get some one to remain with her father and wait on him until she returned. The old gentleman appeared to have implicit confidence in his daughter, and, as a natural sequence, she had great influence over him; but the record shows it was an influence that was acquired by love and affection, and not by unfair means. Seven months after the plaintiff was taken from the care of his daughter, he filed his complaint in equity, containing two causes of action. The first cause of action is to have the deed to the five acres cancelled and set aside, and the second is to have the deed to the ten acres cancelled and declared void. The five acres of land was valued at $750, and the ten acres at $2,000. In both causes of action the court, in substance, found that at the time of the execution and delivery of the deeds in question the plaintiff was weak in body and mind, was able to read and write but little of the English language, and was unable to understand the same but imperfectly, by reason of which facts he was incapacitated from properly attending to business of importance; that the defendant, well knowing plaintiff's said condition, and fraudulently taking advantage of plaintiff's infirmity, as aforesaid, and by false and fraudulent representations and undue influence, procured plaintiff to sign warranty deeds for the land in question; that the deeds, and business transacted concerning them, were in

the English language, and that the purport and meaning of said deeds were not fully understood by the plaintiff; that the defendant then and there represented to plaintiff that the paper which he signed was not to be effective until after plaintiff's death and promised that she would not use the same against him during his lifetime, and that said property should be his as long as he should live; and that plaintiff believed such statements at the time, and relied upon the same. The court, in substance, further found that defendant represented to plaintiff that she had received a revelation and spiritual manifestation, and had been visited by the spirit of plaintiff's wife, and that such spirit had requested defendant to say to plaintiff that it was the wish of said spirit that plaintiff should convey said land to the defendant; that plaintiff relied upon such statements and representations, and was obedient to the desires and wishes of defendant; that said representations were false and fraudulent. The court also found that the consideration paid was wholly inadequate and disproportionate to the value of said property. A decree was entered directing that the deeds be cancelled and set aside. Defendant, within the time allowed by law, moved the court for a new trial on the ground of newly discovered evidence, which consisted of a lease from defendant to plaintiff of the ten-acre tract of land. The lease was executed and delivered to plaintiff at the time the ten acres of land in question was deeded to defendant. It appears from defendant's affidavit filed in support of the motion for a new trial that she can not read the English language, and that, at the time the business was transacted between herself and the plaintiff, the contents of the papers were explained to her by the notary public who drew them, but that she did not understand that the agreement respecting the lease was written out; that the lease was mislaid, and at the time of the trial defendant did not know of its existence; and that subsequent to the trial of the case the lease was accidentally found. The affidavit and that

of her attorney show excusable neglect in not producing the lease at the trial, as neither of them knew of its existence. The motion was overruled. Defendant appeals.

We do not think the court erred in overruling the motion for a new trial. While the lease would completely overcome and wipe out any inference that might be drawn from the evidence of fraud or deceit on the part of the defendant in representing that the paper which plaintiff signed was not to be effective until after his death, and that the property (the ten acres) would be his as long as he should live, as its provisions expressly provided that plaintiff should have the use and benefit of this land during his lifetime, yet it does not overcome or explain away the evidence showing failure or inadequacy of consideration for the ten acres of land.

There are three questions involved in this case, upon which it must be determined: First, was plaintiff's mental condition, at the time the deeds were signed, such as to legally incapacitate him from contracting? Second, did the defendant at the time exercise over him any undue influence, that induced and caused him to execute the deeds, or either of them? And, third, was the consideration sufficient to uphold the transactions, or either of them?

The record shows that plaintiff and his wife had talked over the matter of deeding the five acres of land to defendant as a recognition and reward for the kind care and service she had rendered them, and in particular for the devotion and attention she had shown her aged and helpless mother during the latter's protracted illness, and decided to give her this land. Plaintiff, after the death of his wife, informed one of his sons that she (his wife) had spoken to him about giving Emma a piece of land to build on. He also stated to a neighbor after the death of his wife that he intended to give this piece of land to Emma. Plaintiff assisted in measuring the ground, and on the day and prior to the time the

deed was signed he stated to the party who assisted in measuring the land, and who signed the deed as a witness, that he was going to deed the land (five acres) to Emma, because she had been good to him and attended to her mother when she was sick, and that it was the "mother's impression to him that he should deed the five acres to Emma." The deed was read to plaintiff before he signed it. The party who signed the deed as a witness was called, and testified that he had known the plaintiff for thirty years, and prior to the execution of the deed had frequently met and conversed with him at meetings (church) on different subjects, and formed an impression that plaintiff was mentally sound at the time he signed the deed; that "he had common sense." About this time he disposed of another piece of land to a man by the name of Christensen, who was called as a witness, and who testified that plaintiff "seemed to be in perfect condition, so far as his mind was concerned." In 1893, some eighteen months after the execution of the deed to the five acres, plaintiff sold nine acres of land to a man by the name of Lindall, and in this deal he proved himself competent in every respect to transact his own business. He was three weeks making the sale, and compelled the buyer to pay his (plaintiff's) price for the land. The purchaser was called as a witness, and testified that the impression he formed of plaintiff's mental condition was "that he was sound as any man could be in his mind." He "couldn't find anything wrong with him." Several other disinterested witnesses, whose acquaintance and social intercourse with plaintiff were such as to enable them to know and understand something about the state of his mind, testified that he impressed them as being mentally sound.

The evidence introduced to show that plaintiff was mentally unbalanced at the time he made the deeds, stripped of its verbiage, only tends to show that after the death of his wife he appeared to grow weaker in body and mind; that his mem-

Stringfellow v. Hanson.

ory appeared to be affected; that he would sometimes divert water onto his land out of his turn; that at times he was absent-minded, and in business matters he seemed to be forgetful. On one occasion he purchased a lot of things at an auction sale for which he had no use whatever, and on another occasion he went into the country and bought up a lot of eggs for one of his sons, and paid exorbitant prices therefor. These changes in his demeanor, conduct and actions were not observable to any great extent until long after the deed to the five acres was executed. The evidence is very meager, indeed, that tends to support the contention that there was a perceptible change in his actions and method of doing business, showing mental weakness on his part, before this transaction was entered into. And even if the evidence had shown that his mind at the time was growing weaker, it would not be decisive of this case. For the rule is well settled that it does not follow that because the mind of a party is weakened by trouble and old age, and his judgment thereby impaired, he is mentally incapacitated from executing a deed. Chadd v. Moser, 25 Utah 369, 71 Pac. 870; Pine v. Aldrich, 14 N. Y. Supp. 538. The test is, has the party at the time sufficient reason and mental capacity to understand the nature of the contract he is entering into, and to realize and appreciate the probable results of the transaction? If so, he will be bound by his acts, and equity, in the absence of fraud and mistake, will not relieve him from his bargain, however unreasonable, in the judgment, of others, it may appear to be. 1 Jones, Law of Real Prop. in Conv., secs. 48, 49. In Delaplain v. Grubb, 44 W. Va. 612, 30 S. E. 201, 67 Am. St. Rep. 788, the court said: "Old men, especially when troubled, are very forgetful—very absent-minded; but that does not show that when they come down to the actual act of making a transfer, and have that subject specially and definitely upon the mind, they are incapable of that act. . . . . The time of the execution of the

deed is the material or critical point of time to be considered upon the inquiry as to the grantor's capacity. . . . Even if his mind were weak and debilitated, compared to what it had been, his demeanor on occasions eccentric, and even if he had not capacity to transact general business, yet if he understood, as he clearly did, the nature of that particular act—recollected the property he was disposing of, and the person to whom he was giving it, and how he desired to dispose of it—that is enough to make his act valid." Applying the foregoing principles to the facts in this case, the conclusion is irresistible that plaintiff was competent to legally dispose of his property at the time he executed the deed to the five acres.

We think the record wholly fails to show that defendant exercised any undue influence over the plaintiff at the time of, or prior to, the execution of the deed to the five acres. There is some evidence in the record that she (the defendant) had stated to some of her neighbors that she had received a revelation from her mother, and that it was her mother's wish that plaintiff deed the land in question to her, and that she had communicated these alleged spiritual manifestations to her father. Plaintiff's deposition was taken in his own behalf, and read in evidence. He testified that, before the deed was made, Emma had spoken to him two or three times about having a revelation from her mother, but he does not state that he was influenced or induced to make the deed because of the alleged revelation. On the contrary, he repeatedly reiterated that he deeded the land to her because it was the wish of his wife, before her death, that Emma should have it, and because she had been kind to them, and had taken care of her mother during the latter's sickness. We do not think the finding that defendant used or exercised undue influence over plaintiff at the time the deed to the five acres was executed is supported by the evidence. It is a

well-established rule of law that when a parent, who is legally competent to contract, makes a gift to his child in consideration of love and affection, it will be upheld. The conduct of Emma Hanson toward her aged parents was such as would naturally tend to inspire their love and gratitude, as it was clearly shown that she, for two years, with but little, if any, aid from any of her brothers or sisters, or other relations, constantly cared for and waited upon her invalid and helpless mother, and after her mother's death continued to care for, comfort, and administer to the wants of her old father in his bereavement. And the record affirmatively shows that in pursuance of the high and commendable devotion thus shown, and services rendered, and in pursuance of the mother's wish, made known to plaintiff, before her death, as shown by his own testimony, plaintiff conveyed to defendant the five acres of land in question. Under these circumstances we think the consideration was not only meritorious, but valuable, and in every respect adequate. 1 Jones, Law Real Prop. in Conv., 274; Brinton v. Van Cott, 8 Utah 480, 33 Pac. 218. In the case of McCall v. McCall, 135 U. S. 167, 10 Sup. Ct. 705, 34 L. Ed. 84, Mr. Justice Brewer, speaking for the court, said: "Right or wrong, it would be expected that a parent will favor a child who stands by him, and give to him, rather than the others, his property. To defeat a conveyance under these circumstances, something more than the natural influence springing from such relations must be shown—imposition, fraud, importunity, duress, or something of that nature, must appear." Again: "It would be a great reproach to the law, if, in its jealous watchfulness over the freedom of testamentary disposition, it should deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them."

It is contended by respondent that the only consideration for the conveyance that can be considered is that expressed

in the instrument itself. We do not understand this to be the law. The rule is that in cases such as the one under consideration, where the rights of creditors are not involved, the entire consideration may be shown. Devlin on Deeds (1 Ed.), sec. 822; 1 Jones, Real Prop. in Conv., sec. 295; Rankin's Adm'rs v. Wallace (Ky.), 14 S. W. 79; Barbee v. Barbee (N. C.), 13 S. E. 215.

The facts and circumstances leading up to and surrounding the execution and delivery of the deed to the five acres are different from those under which the transfer of the ten acres was made. The evidence shows that, after defendant received the deed to the five acres of land, she had the use and benefit of the ten acres, upon which there was a dwelling house; and there is evidence in the record tending to show that she received from plaintiff and collected money belonging to him amounting to $1,400, in the aggregate, and for which she has made no accounting. The means thus received, if they were received by her, would, no doubt, amply pay her for the care and attention she bestowed upon her father subsequent to the making of the first deed. In view of this evidence, and the fact that no part of the consideration expressed in the deed has been paid, we do not think the finding of the trial court that there was a failure of consideration ought to be disturbed, but that the judgment, in so far as it is based on the second cause of action, should be affirmed.

We are of the opinion, and so hold, that the decree should be modified so as to give defendant the five acres of land described in the first cause of action. The cause is therefore remanded to the trial court, with directions to modify the judgment in accordance with the views herein expressed. Each party to pay their respective costs on this appeal.

BASKIN, C. J., concurs.

BARTCH, J. (dissenting from part of the judgment).— I am unable to concur in this judgment in its entirety, nor in

the reasoning of the majority by which they arrive at their conclusions, nor in their view of the facts, nor as to what the evidence establishes; and as this is, or ought to be, an application of equitable principles to determine property rights between an old parent, weak in body and mind, and a child physically and mentally strong, who has managed to secure all of the parent's property, I am impelled to present my views of the case.

The action is one in equity to declare void and cancel two warranty deeds, purporting to convey certain real estate, executed by John Peter Johnson, to the defendant. The suit was brought by the grantor in his lifetime, but after the trial of the cause and decision by the lower court he died, and thereafter the special administrator was substituted as plaintiff. The grounds upon which it is sought to avoid the deeds are infirmity of body and mind of the grantor at the time of execution, and fraud and undue influence practiced and exercised by the grantee.

From the evidence it appears, in substance, that the plaintiff and defendant were father and daughter, and were foreigners (the former having come to this country in 1866, and since then, until his death, lived in Salt Lake City; the latter having come to this country in 1875, and lived in this county ever since); that the father could write his name and read a little in English, and could read and write in Danish; that at the time his deposition was taken for this case he was eighty-three years of age; that he had eleven children; that his wife died on June 30, 1891; that before her death the father was strong and healthy, but after that he began to get weak in body and mind; that for about two years prior to the death of the mother, who was, for the last six months of her life, paralyzed, the defendant took care of her; that after her death the defendant lived with her father and cared for him until he was taken away from her by some of the other children, in July, 1900; that she received no pecuniary

remuneration for her services, except a living for herself and child, which was made from the land in controversy; that on January 19, 1892, the father executed the deed to her, for the five acres in question, for a cash consideration of $50, which she paid him at the time of the execution of the deed; that the land was worth $750; that on April 30, 1895, he executed the deed to her for the ten acres in question herein, without receiving any money therefor, although the land was worth $2,000; that the grantor was a sincerely religious man, and both he and his daughter belonged to the Mormon Church, and believed in revelations from the eternal world; that prior to the execution of either of the deeds the daughter represented to her father that she had a revelation, and that her mother had appeared before her from the spirit world, and requested her to tell him that she wished him to convey the land in question to defendant, and that she (defendant) should take care of him as long as he lived; that the father was susceptible to religious influences; that at the time the deeds were executed he was feeble in body and mind; and that he was generally submissive to his daughter's will and wishes. His son Joseph S. Johnson testified that his mind kept getting weak right along after his wife died; that this conclusion was drawn from what his father did and said; that he was unable after his wife's death to transact business that required thought or attention; and that on one occasion, just before the death of the wife, the father said he wanted to dispose of twenty acres of land, and the witness secured a buyer who offered him $1,500 cash, but that the father "turned around and sold it to another party for $1,000, and seven years' time to pay it in." The witness Naylor, who knew the father ever since 1866, testified that for some time previous to the death of his wife he noticed a change in his condition; that after her death his condition was very poor, both mentally and physically; and that he did not believe he was able to transact business intelligently. The witness also gave in-

stances of the difference in his condition.   The witness Proctor, who had known him since 1873, and saw him very frequently in 1891 and 1892, testified that he noticed a change in his condition after the death of his wife, and in 1892 noticed that his memory was very poor, and "did not appear to know how to answer questions and put them in the way he should do."   The witnesses Christensen, Hansen, Winchester, Albert Johnson, Mary C. Phillips, and Lind all testified to the noticeable weakened condition of the father's mind after the death of his wife, in 1891.   A number of the witnesses detailed circumstances of controlling influences which the defendant exercised over her father, and numerous witnesses testified to the fact that the father was of a very religious turn of mind, and particularly susceptible to religious influence, and believed in revelations.   From the testimony of witnesses for the plaintiff it appears that, before the father was taken away from the defendant, he was kept in an untidy condition, without clothes fit to wear, and without proper or strengthening food.   This, however, is controverted by witnesses for the defense, who stated that he had proper care, clothes, and food. The plaintiff's evidence also shows that about the time of the death of the mother he had about $1,400 in money; and on the part of the defense it is shown that whatever money he had was used in payment of debts, a mortgage amounting to about $400, living expenses, and contributions to the church. It appears all the children except the defendant left their parents before the death of their mother.   There is also some testimony to the effect that at the time of the conveyances the grantor did not comprehend the nature of the instruments —did not understand that he was making absolute conveyances of his property.   It appears that on several occasions after the deeds had been executed, and before the suit was brought, when, upon being informed that he had conveyed his property, he asked the defendant whether it was so that he conveyed his property to her, and that she told him he had not; that

such rumor was false. Finally, however, she admitted to
him that he had conveyed the property to her, and thereafter
this suit was instituted. It was admitted by the pleadings
that at and before the time of the execution of the deeds the
grantor was the owner of the premises in dispute. After hear-
ing the case, the court entered a decree in favor of the plaintiff,
declaring the deeds void, and ordering the defendant to de-
liver them up to be cancelled.

The appellant contends that the court erred in making
the first and fifth findings of fact, relating to the first and
second causes of action, wherein it was found that, before and
at the time when the deeds were executed, 'the plaintiff was
the owner in fee of the premises which the deeds purported
to convey, and that he is now such owner, and is entitled to
the possession thereof.

It is insisted, upon the first point, that there is no com-
petent evidence of any kind that the plaintiff was the owner
of the land or had title to it, and that, if he was not the
owner he was not injured by the conveyances sought to be
cancelled. There is no merit in this insistence. The answer
to it is that there was no necessity whatever for introducing
evidence on this point, because the plaintiff's ownership of the
premises before and at the time the deeds were made was
expressly admitted in the answer. Whether he is now the
owner and entitled to the possession of the premises presents
another question.

The deeds are in legal form, with covenants of warranty,
and of record; and where a warranty deed is executed, de-
livered, and recorded, the presumption is that the grantor
had a title which he could convey, and that by his deed the
title to the premises described therein passed, and vested a
seisin in the grantee. 3 Wash., Real Prop., 133. Such is
doubtless the effect where the grantor at the time of the
transaction was not incapacitated, mentally or otherwise, to
make a valid conveyance or contract; and so long as no in-

capacity, fraud, or mistake is shown, the grantee may rely on the terms of the instrument of conveyance. Where, however, it is alleged, as in this case, that at the time the deeds were executed the grantor was illiterate, infirm, and so weak in body and mind that he was subject to undue influence, and was incapacitated to attend to any matters of business, then, upon such infirmity of body and mind or incapacity appearing in evidence to have so existed, the burden of proof is thrown upon the grantee to show that the grantor's acts were wholly voluntary; that his mind, though weak, was of sufficient strength and clearness to enable him to comprehend the nature and effects of the transaction; that he did not act through fear, ignorance, misrepresentations, fraud, or undue influence; and that no undue advantage was taken of his condition or necessities. Especially is this so where fiduciary relations exist between the grantor and grantee, as between parent and child, and where there is gross inadequacy of consideration. In such case it must be shown that the transaction was consummated in perfect good faith, and that the will of the grantee or some other person was not substituted for that of the grantor. And where at the time of the execution of the deed the grantor, although not wholly incapacitated to transact business, as in case of one who is *non compos mentis,* was very weak in body and mind—the result of old age, sickness, or other cause—and fiduciary relations existed between him and the grantee, and there was no consideration, or the price paid was greatly inadequate, a court of equity will grant relief at the instance of the party aggrieved; it being, if not absolutely void, voidable. From such circumstances fraud or undue influence will be inferred, and it would be against conscience to permit him who had obtained the deed from the grantor after his mind had ceased to be a safe guide of his actions to derive any benefit or advantage from the conveyance. "And it is quite immaterial from what cause such weakness arises—whether it arises from tempo-

25 Utah—32

rary illness, general mental imbecility, the natural incapacity of early infancy, the infirmity of extreme old age, or those accidental depressions which result from sudden fear or constitutional despondency or overwhelming calamities. For it has been well remarked that, although there is no direct proof that a man is *non compos* or delirious, yet if he is a man of weak understanding, and is harassed and uneasy at the time, or if the deed is executed by him in extremis or when he is a paralytic, it can not be supposed that he had a mind adequate to the business which he was about, and he might be very easily imposed upon." 1 Story's Eq. Jur., sec. 234. In Bispham's Prin. Eq., p. 29, sec. 235, the author says: "Transactions between parent and child, while not viewed with the same degree of suspicion as those between guardian and ward, are nevertheless always closely investigated in equity, and will be set aside if there is the slightest evidence of imposition or unfairness. The mere existence of the relation of parent and child, it has been said, is not, perhaps, enough to vitiate an act which, as between strangers, would have been valid; but the modern English authorities seem to favor a stricter rule. Of course, if there is any evidence of pressure or influence unduly exercised, the transaction can never stand." In Pomeroy's Equity Jurisprudence, vol. 2, sec. 928, it is said: "When the accompanying incidents are inequitable and show bad faith, such as concealments, misrepresentations, undue advantage, oppression on the part of the one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities; and the like, on the part of the other, these circumstances, combined with inadequacy of price, may easily induce a court to grant relief, defensive or affirmative. It would not be correct to say that such facts constitute an absolute and necessary ground for equitable interposition. They operate to throw the heavy burden of proof upon the party seeking to enforce the transaction, or claiming the benefits of it, to show

that the other acted voluntarily, knowingly, intentionally, and deliberately, with full knowledge of the nature and effect of his acts, and that his consent was not obtained by any oppression, undue influence, or undue advantage taken of his condition, situation, or necessities. If the party upon whom the burden rested should succeed in thus showing the perfect good faith of the transaction, it would be sustained. If he should fail, equity would grant such relief, affirmative or defensive, as might be appropriate." Mr. Justice Field, delivering the opinion of the court, in Allore v. Jewell, 94 U. S. 506, 24 L. Ed. 260, said: "It may be stated as settled law that whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will, upon proper and reasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside." In Spargur v. Hall, 62 Iowa 498, 17 N. W. 743, where a daughter, through undue influence, and without adequate consideration, procured from her aged and infirm mother the execution of a note, and a mortgage securing the same, the instruments were cancelled at the instance of the heirs, although at the time of their execution the mother had a contracting mind, but her mind, by reason of her age, infirmities, and the death of her husband, which occurred about a year previous, was feeble and easily led to erroneous conclusions. The Supreme Court, in affirming the judgment, said: "Contracts made between persons sustaining these relations of trust and confidence, where it appears that the stronger and controlling mind has obtained a conveyance of property or an obligation to pay money, are jealously watched and guarded by courts of equity, and set aside unless the beneficiary shows the bona fides of the transaction." So, in Harding v. Wheaton, 2 Mason 378, Fed. Cas. No. 6051, deeds pur-

porting to convey certain property, procured by a son-in-law from his father-in-law, upon a verbal arrangement that the conveyance should be considered as a trust for the maintenance of the grantor, and after his death for the benefit of his heirs, were, after the death of the grantor, upon application of his heirs, set aside, except as security for actual advances and charges, on the ground that at the time of the execution of the instruments the mind of the grantor was enfeebled by age and the visitation of Providence. Mr. Justice Story, in deciding the case, said: "Extreme weakness will raise an almost necessary presumption of imposition, even when it stops short of legal incapacity; and though a contract, in the ordinary course of things, reasonably made with such a person, might be admitted to stand, yet if it should appear to be of such a nature as that such a person could not be capable of measuring its extent or importance, its reasonableness, or its value, fully and fairly, it can not be that the law is so much at variance with common sense as to uphold it." 2 Pom., Eq. Jur., secs. 951, 955, 956; 1 Story's Eq. Jur., sec. 238 et seq.; 9 Am. and Eng. Ency. Law (2 Ed.), 124; 1 Bigelow on Fraud, 358, 359; Harding v. Handy, 11 Wheat. 103, 6 L. Ed. 429; Griffith v. Godey, 113 U. S. 89, 5 Sup. Ct. 383, 28 L. Ed. 934; Jacox v. Jacox, 40 Mich. 473, 29 Am. Rep. 547; Sands v. Sands, 112 Ill. 225; Odell v. Moss, 130 Cal. 352, 62 Pac. 555; Thorn v. Thorn, 51 Mich. 167, 16 N. W. 324; Oard v. Oard, 59 Ill. 46; Frazier v. Miller, 16 Ill. 48; Highberger v. Stiffler, 21 Md. 338, 83 Am. Dec. 593; Hinchman v. Adm'rs of Emans, 1 N. J. Eq. 100; Graves v. White, 4 Baxt. 38; Simpler v. Lord, 28 Ga. 52.

It now becomes important to look into the evidence, in the light of the foregoing principles, and ascertain whether the mind of the grantor at the time of the execution of the deeds was in such a condition that his acts can be upheld. From the testimony it appears that when the first deed was executed the grantor was about seventy-four, and at the time

of executing the second about seventy-seven years of age. His wife died about a year previous to the execution of the first deed.    The loss of his wife, it appears, had a distressing effect upon him.    From that time on he became weak in body and mind.    Those around him noticed the change in his condition physically and mentally.    In ordinary business transactions, it seems, he was no longer capable of properly guarding his interests.    There are circumstances showing that he was easily led to erroneous conclusions.    His daughter, the grantee in the deeds, lived with him, after the wife and mother was gone, in his feebleness during his declining years, until he, not very long before his death, was removed from her by some of the other children, because, they say, he was not well cared for, but was in a pitiable condition—kept unclean and without proper food and clothing.    As to whether this is true, or as to how the daughter performed the high and sacred trust of caring for her old father in his feeble condition, the evidence is conflicting; and, lest I might err in my opinion as to whose testimony is true, I refrain from comment, the same not being essential in the disposition of the case. However the solemn obligation which the daughter assumed may have been discharged, the conclusion impelled by the proof is that her will generally prevailed over that of her father.    She was with him, and advised him about matters transpiring, and he at least usually submitted to her wishes; and it seems the other children had little, if any, opportunity to talk to him without her presence.    Her conduct, as it appears from the evidence, clearly suggests a purpose on her part to secure an advantage over the other children, and this is strengthened when it is considered that finally she told him of the revelation; that her mother had appeared to her from the spirit world and told her to tell him that it was the mother's wish that he should deed the property to the daughter. Who can say that such a wish, from the loved one that was gone, had not the effect to direct and control the action of him

whose sorrow for the loss of that loved one, as indicated by the proof, had already greatly weakened him in body and mind, and who believed in revelations, as a tenet of his church? That this and the influence of the daughter had the desired effect is manifest from the fact that thereafter she obtained conveyances of his property, worth $2,750, without consideration, except $50 paid by her, which reduced him to poverty, and left him dependent for his future maintenance upon her mercy. It is also significant that the grantee endeavored to conceal the transaction from the other children, and the nature and effect of it from the grantor, who, it seems, not being able to read the English language, was not aware that the instruments were deeds in form absolute, and that he had actually parted with his property. On several occasions when asked by others in his presence, she denied the fact that he had sold the property to her, and then, when asked by him whether it was true that he had conveyed it to her, she replied that he had not, that he still owned it, and that the rumor was false; but finally, before the institution of this suit, she admitted to him that he had conveyed it to her.

Without referring further to the evidence in detail, it is apparent that the grantee exercised undue influence over the grantor, and that when he executed the instruments he was not acting as a free agent, but his will was dominated by the will of her in whom he evidently confided. This is simply a case where it was sought to profit and gain an advantage through a violation of trust and confidence, and it can never be upheld in equity. In dealing with a person whose mind is weak because of age or the visitation of Providence, equity, as we have seen, requires the utmost fairness; and it will afford protection and relief, because of infirmities, when the law, owing to its universality, can not. All conveyances obtained by children from parents and parents from children are objects of jealous and close scrutiny in equity and unless they are reasonable, under the circumstances, and made with

scrupulous good faith, will be set aside on proper application. Suppose in this case the situation and relation of the parties were reversed, and the father had the strength of body and mind, and the child the infirmities, and through overweening confidence in the parent, and in accordance with his wish, the child were the grantor and the parent the grantee; would a court of equity, under the circumstances, hesitate to grant relief by setting aside the transaction and cancelling the deeds? Clearly not. And if not, then there ought to be no hesitancy when, through the infirmities of old age or other causes, the parent becomes the child, and the child the guardian or ruling spirit, for in either case the same reason exists, *et ubi eadem ratio, ibi idem jus;* and the law makes no distinction between such cases, *et ubi lex non distinguit, nec nos distinguere debemus.* In either the principle is the same. The wish of the strong is the will of the weak. The grantee suggests. The grantor executes. There is no consent of two minds, but a merger of two into one. In this case there was not only the exercise of undue influence, but concealment and misrepresentation which amounted to fraud. The result was conveyances which left the grantor practically penniless and dependent upon the charity and mercy of others. In Thorn v. Thorn, 51 Mich. 167, 16 N. W. 324, where a father eighty years old, infirm and easily wrought on, was induced to convey his land to his son for an expressed consideration of $4,000, most of which was illusory—the grantor not understanding that he was absolutely depriving himself of his property—the court, in rescinding the deed and ordering a reconveyance, said: "If we gave credit to defendant's own version of these transactions, complainant has, while living with defendant, allowed him to absorb his personal property and all of his real estate, and is left without anything to represent it, and without any security whatever for his support. He has been rendered practically a pauper, and has destroyed or given up such partial assurances as he at one time had.

That such a result has been the deliberate and understood purpose of a person of sound mind and free from fraud or undue influence is preposterous. Such a state of things indicates beyond question either incapacity or dishonest management or both. We think there is enough appearing in the case to indicate cunning and deception. But the dealings, however managed, are intrinsically wrong, when a person in a fiduciary relation occupied by defendant, as his father's agent and factotum, manages to get all that his father possesses into his own hands. Nothing but a clear and satisfactory explanation could under any circumstances save dealings which have such an outcome. The old man's feebleness of memory left him very much at defendant's mercy, but defendant's own showing is anything but satisfactory." Sands v. Sands, 112 Ill. 225; Jacox v. Jacox, 40 Mich. 473, 29 Am. Rep. 547. The mere relations, situations, and conditions of the grantor and grantee herein, in my judgment, condemn these transactions.

From the foregoing considerations, and a careful examination of the record, I am of the opinion that the court did not err in finding that the father was still the owner of his property, notwithstanding his execution of the deeds, nor in holding the deeds void. Since, however, the father, who is now dead, was permitted to remain under the care of the grantee for a number of years, without objection, so far as shown by the proof, from the other children, who now say that his wants and necessities were not provided for properly, and as I am not satisfied that such other children discharged the sacred obligations which they themselves owed their old father in his infirmity, I am inclined to hold that the $50 which the grantee claims to have paid should be returned to her, and that if, in the settlement of the father's estate, it should be found that she ought, in justice, to have some compensation for her services in caring for her father, the proper

Stringfellow v. Hanson.

tribunal should allow her such sum as will be just and equitable.

I am therefore of the opinion that the cause should be remanded, with directions to the court below to modify the decree accordingly, and, upon the same being so modified, it and the judgment should stand affirmed, and that each party should pay his or her own costs, and that the costs of court should be divided equally between the parties.