Hoffheimer, J.
This is an action wherein the plaintiff seeks to set aside certain deeds that had been executed by him to his sons, Theodore *580 and. John T. Taphorn. The property involved, it is asserted, is worth about $70,000, .and the petition inter alia recites:
"That between the fifth and tenth day of January, 1907, his two sons, the defendants herein, Theodore Taphorn and John Taphorn, well knowing his condition and his incapacity to transact business or resist their importunities, began to systematically, on every day during said period, urge, importune and insist that he should make to them' deeds of all of his property, consisting of the real estate hereinafter described, and should transfer to them all the moneys which he had in bank.
"That the plaintiff was at said times wholly incapable of understanding the effect upon him of the making of such transfer and was so broken down by age and sickness, that he was incapable of exercising an independent judgment with reference to his .affairs and with reference to such transfer of his property.
"That while in this condition said defendants, Theodore Tap-horn and John Taphorn, had four deeds drawn to themselves, conveying all the real estate of which the plaintiff was then the owner, each reciting a consideration of one ($1.00) dollar, love and affection and other good and valuable considerations to him paid, .although in truth and in fact no consideration whatever was paid by said defendants to him for said property; and while this plaintiff, .as they well knew, was wholly incapable of understanding the nature of said transactions and wholly unable to resist their importunities, compelled him to sign said deeds, reserving to him a life interest therein, and providing that his wife, Marie Taphorn, who was then about eighty-four years of age, should have a lien thereon for support during her natural life if she survived the plaintiff.
“That on the 11th day of January, 1907, the defendants, Theodore Taphorn and John Taphorn, caused said deeds to be recorded in the recorder’s office of Hamilton county, Ohio.”
The defendants deny that grantor was mentally incapable of understanding or unfit to transact the business affairs in which he had been engaged. They admit the execution of the deeds and their delivery; that these deeds reserved a life estate • to plaintiff and provided that /plaintiff’s wife should have a lien on the property for her support during her natural life if she survived plaintiff; they admit the deeds were recorded.
They .also admit receiving $5,200 from plaintiff, which at his request they later returned.
*581 Under these pleadings' the question is, was there total and technical incapacity of grantor to execute these deeds? Was there undue influence?
In the presentation of this case it was urged that undue influence was to be presumed, because of the confidential relations of these parties (father-and sons). And it was claimed that this presumption was strengthened, because at the time of the execution of the deeds, the grantor was in a state -of great physical and mental weakness. These conditions, it was contended, cast the burden of proof on defendants, to show the transaction was fair, free from undue influence (a species of fraud), and that grantor fully understood the nature of the entire transaction.
This argument assumes (a) .incapacity; (5) the existence of a confidential or fiduciary relation.
As to the lack of capacity, the evidence falls decidedly short of establishing that claim. There is no imbecility or mental weakness such as often accompany senility. The physical and mental weakness, -if .any existed, was in no sense attributed to old age but to the stroke of .paralysis — hemiplegia. From the evidence, however, I am satisfied that this affliction did not affect the grantor’s mental powers, and note in passing that in Keck v. Sayre, 3 N. P., 45-50, among the cases cited by plaintiff (involving paraplegia), Judge Sayler, coming to a similar conclusion, said:
“I think the testimony tends to show that paraplegia does not affect the brain.”
If it could be said, however, that there was some mental weakness present due to the hemiplegia (testimony of Dr. Beebe), I do not think in view of the evidence that it could have’ amounted to even technical incapacity' to execute the deeds in question, and in view of the nature of these deeds.
Taking up now the relations of these parties, were they of a confidential or fiduciary nature? In a few certain relations, such as guardian and ward, trustee and cesfoii que trust, attorney and client, and probably parent and child, where the parent is the - beneficiary (although here the presumption may *582 not be so strong, but see Modern English rule, Bishp. on Equity, Section 235, n. 5, and cases cited) ; -the relation itself ipso fado casts the burden on the beneficiary to prove the transaction was free from fraud. Berkmeyer v. Kellerman, 32 O. S., 239, relied on by plaintiff, oomes within this principle, and is in no sense authority where -a gift from parent to child is involved, unless perhaps it could be said that the natural relations had been reversed by time or infirmity, a question to be hereafter discussed. The doctrine above adverted to, however, is not confined to the particular or special instances named but is general. While the doctrine is extended to other relations of trust and confidence, or inequality, the trust, confidence or superiority on one side, and dependence on the other side, must be proven. In other words, in eases other than the special instances referred to, the confidential and fiduciary relation must be established, as one of fact, by the (preponderance of the evidence.
If, in this case, the confidential or fiduciary relation were thus established, then physical and mental weakness, if .any there were, would be a factor simply strengthening that presumption. In dealing with relation of parent and child the books recognize that it is the influence of the parent that is to be guarded .against. No influence is to be presumed in gifts from parent to child (Clark v. Clark, 174 Pa., 336, and cases cited). On the contrary, such gifts are regarded with favor. In Saufly v. Jackson, 16 Texas, 579, it was said:
‘ ‘ * ® * It is clear that this rule was never applied, either unqualified or qualified, to a deed of gift from a parent to a child, and the reverse of such principle has always been sustained. And there is not believed to be a single exception to the principle that a deed from a parent .to a child is- always regarded with favorable eye and every presuxxxption is ixi favor of its validity.”
It sometimes happens, however, and so it is contended here, that time and sickness reverse the natural relations, .and under such circumstances the rule pertaining to gifts from child to parent should be applied. In Bigelow on Fraud it is said that the principle -applicable to gifts by .a child to parent -applies where the natural position of the parties has become reversed. *583 and the child has become the guardian of his aged and infirm parent. See also, B.isp. Equity, Section 235.
But while the parent in this ease was old and stricken, there was no dependence on these sons. He had not been nor was he insane or weak-minded (elements which were present in Mott v. Mott, 49 N. J., 192, and Highberger v. Stifler, 21 Md., 339); there was no “equitable wardship” or assumed guardianship of the father, by the son, because the son had believed the father to be incompetent, as in Jacox v. Jacox, 40 Mich., 473, which are among the leading authorities cited and relied on by plaintiff. On the contrary, this plaintiff was a man who, up to the day he was stricken, possessed unusual mental and physical vigor, and, as stated, was not mentally affected by the hemiplegia.
But in 2 Pomeroy’s Equity Jurisprudence (3d Ed.), Section 962, we find the rule to be stated as follows:
“Where the positions of the two parties (parent and child) are reversed, where the parent is aged, -infirm or otherwise in a condition of dependence upon his own child, and the child occupies a corresponding relation of authority, conveyance conferring benefits on the child may be set aside. Cases of this kind turn upon the exercise of actual undue influence and not upon any presumption of invalidity; a gift from a parent to a child is certainly not presumed to be invalid.”
I can not say that the evidence establishes any confidential or fiduciary relation in the case before me; the sons did not exercise any control or dominion over their father. He was not dependent upon them in any ásense. In these particulars the case is readily distinguishable from those relied on by plaintiff, although the rule set out in Pomeroy, supra, which has been followed in numerous -instances by courts of dernier resort (cases, note 4c), is the rule to be applied here.
The burden of proving actual .undue influence being on plaintiff, we must look to the evidence to ascertain whether it has been sustained. At the time of the execution of these deeds plaintiff was over eighty years old. Up to the day of the stroke, as already stated, he was unusually-vigorous, mentally and physipally. In fact, the disease which oyertook him found him ao *584 lively engaged .at hard work. Five or six years'before this time he had determined, as was his right, to disinherit the Kotte children, children of a deceased daughter. Consistent with this fixed idea he executed his will. In this will, after providing for his wife for life, he gave all the rest of his property (the same property here involved) to these two sons (defendants ); These sons assisted their father in building .a number -of the houses here involved, and for their labor the one received the pay of the ordinary laborer, while it seems the other received somewhat better remuneration. They received very little financial aid from their father other than what they thus earned. The father, however, had fully acquainted these sons with his determination to cut off the Kotte children at the time his will was drawn, and when it was thought there might be trouble, it was suggested that the sons take the will, which his lawyer had drawn, to another and disinterested lawyer for advice as to the validity and effectiveness of the will. This will the father never revoked, all of which the sons well knew. On certain occasions prior to the attack of hemiplegia these sons had requested their father to deed them the property. He did not do so. On one occasion, a year or two before the sickness, they requested .an old friend of the family to urge their father to execute these deeds, but the father declined. At such times the father was still vigorous and active. It is not proven that the sons induced the intention expressed in the will by which the property was ultimately to be theirs. On the con-tr-ary, the idea seems to have originated with the father. It does not appear prior to the execution of these deeds that he intended to change the intention thus expressed in the will in their behalf; on the contrary, he steadily adhered to his intention to give the property to these sons at his death, and he gave them to understand that fact.
The evidence further shows that for some hours after the “stroke” the physicians .entertained but little hope for his recovery and in fact he received the final ministrations of the church for one in extremis. Shortly afterwards, however, the plaintiff rallied. Within a day or so he rallied sufficiently to receive a number of visitors. It does- not appear that he failed *585 to recognize a single person; on the contrary, he recognizes and chats with everybody. To some he describes minutely the sensations experienced while the attack was coming on. He details how he was carried into the house, -and he describes his condition and his sensations with marked fidelity to detail, as shown by the testimony of others. On Wednesday he talked with an old business friend (Gerhardt Schmidt) “a good deal about other business matters.” He told him about the five thousand dollar note transaction which had been bothering him at that particular time, and concerning which transaction he had during this very week (after the stroke) given intelligent and pertinent instructions to his' housekeeper, Mrs. Buening. These instructions Mrs. Buening carried out to the letter and made due report to him, of what she had done. In speaking with Schmidt he evinced interest in the farm and he asked him to go out and look at the cattle. Mrs. Buening (witness for the plaintiff), and who admits a certain amount of hostility to the sons, testified to Ms very bad physical 'Condition, but it is not likely that she entertained the opinion that at the particular time here under inquiry, the plaintiff suffered any mental eclipse or mental insidficieney, for when (ias she claims) she overheard the boys say, “Now is the time to get deeds,” she “thought she would look out for herself,” .and she .asked plaintiff (regarding the contemplated arrangement to give her five hundred dollars in full for her services) “if that was the best he could do.”
In the contract afterward made she received one thousand dollars. And it appears that the plaintiff had considered the matter and had come to a different conclusion upon it. During this same time he greets the wife of one of these defendants, who had come to visit him, and inquired .as to the condition of some of her relatives whom he remembered had been injured in a street railwáy accident a short time before. He tells Carrol (see .testimony of Carrol) before he signs the deeds, “That he is going to deed it all to the boys and get shut of the Kayser or Kotte children.” This statement is overheard by the father’s attorney who is present at the time. It is not clear whether the idea of deeds originated with the father or whether he offered *586 to execute them because of some conversation suggesting possible trouble with the Kotte children. The son, Theodore, quotes his father ,as having said, “In ease of trouble I would rather make it stronger for you so there- wont be trouble, ’ ’ or whether the suggestion moved from the sons. Both sons say it was-the father’s suggestion, but in view of the oft-expressed desire of these sons to have deeds, and in view of Mrs. Buening’s testimony that she overheard them discussing the -advisability of getting the deeds- “now,” and in view of their eagerness and manifest endeavor for some time previous in this direction, let us .assume for the argument that these sons urged and persuaded their father to make these deeds. Let us even 'assume that, but for such appeals- their father would not have executed these deeds; can .a chancellor under such a state of facts say that this was undue influence? In Truman V. Lore, 14 O. S., 144, 156, Peck, C. J., speaking for the court, lays down the test for undue influence. Tru-e, -that was an -action at law, but the -court in the course of the opinion says:
“Courts of equity will not vacate a deed -obtained by means-of influence or importunity unless it has been unduly or improperly exercised. Fair argument and persuasion or appeals to the conscience or sense -of duty of the grantor, especially by those having claims upon his justice and his bounty, if fairly made, lay no foundation for vacating a deed, although the grantor would not have executed it but for such appeal, argument or persuasion.”
That these sons had some claim upon the justice -and bounty -of their father will probably not be denied. Assuming that-they urged their father to execute these deeds, ther-e is nothing to show that their influence was unfairly exercised (considering also the fact that they did not originate the intention of ultimately making them the beneficiaries- -of this property to the -exclusion -of the Kotte children), unless it could be said -there were circumstances of infirmity present which rendered him unfit to know what he was doing or unable to resist their appeals.
From the .reference .already made to his condition it is certain plaintiff was neither insane nor weak-minded. While weak, *587 a side light is thrown • on his physical condition by Gerhardt Schmidt commenting on his firm grip on Wednesday preceding the execution of these deeds (see testimony of Schmidt). Reference has already been made to his lucid conversations with Bunker, Carrol, Mrs. Taphorn, Schmidt and others. But the testimony of Mr. ITauck, who had been sent for to act as his attorney, and who had acted in that capacity several times during the previous four or five years for this plaintiff, and whose testimony would seem to me to be disinterested, must have controlling influence upon this question, and it can lead to but one conclusion, and that is that plaintiff knew and understood what he was doing, and acted voluntarily.
When the attorney entered the sick man’s room on the 9th inst., plaintiff immediately recognized him, and proceeded to relate to him the circumstances of the stroke, and narrated the details following it. He stated that he was an old man; that he had worked hard; had denied himself during his whole life, and that he now wished to dispose of his property to Theodore and John. The attorney advised that he execute a will. Thereupon the old will was produced and read by the attorney, and then there was some discussion in plaintiff’s presence as to the advisability of a division, but Hauck advised a joint deed. Plaintiff suggested that he desired to reserve the right to collect the rents during his life. He spoke very low; would lapse into a seeming sleep. On rousing himself he would go on and “his answers were intelligent.” The attorney was to return the next day with the deeds. He was late in returning and plaintiff himself commented on his lateness or tardiness. The attorney read one deed to the plaintiff and told him that all the other deeds were similar except as to description. He told hini that he had made provision for the wife in all the deeds which he (plaintiff) said was “all right.” He was very weak when he' signed these deeds but considering that the deeds were signed under the condition in which he was in, that he was propped uip in bed, the inspection of his signatures shows them rather clear, distinct, no letters omitted and bearing the peculiar characteristics of his signature, from all of which it would appear that neither on the 9th or 10th was he deprived of rea *588 son, or understanding, or will power, even though he may have been very weak. Under such circumstances I can not say there existed circumstances of .any infirmity such, .as to render the appeals of his sons, if such there were, unfair or undue influence. At least, I can not say that that is shown by a preponderance of the evidence, and if undue influence must be .established by clear and convincing testimony, >as would seem to be required in Willis et al v. Baker, Guardian, 75 O. S., 291, then certainly plaintiff has failed to make out a case.
Healy, Ferris & McAvoy, for plaintiff.
Louis J. Dolle and Walter C. Taylor, for defendants.
As I view the ease, however, having particular reference to what plaintiff said to his attorney when the attorney entered the room on the morning of the 9th (supra), the deeds that were executed the next day were testamentary in character, and, testing his capacity by the degree of capacity required to execute a will, which would be the proper test for testamentary deeds, I think the evidence showed that he had such capacity. See Kime v. Addelsperger, 2 C. C. — N. S., 270, 275; Pepple, Guardian, v. Pepple, 13 C. C., 43.
If after the execution and the recording of these deeds plaintiff forgot he executed the same, or if he saw fit to change his mind because he believed he was going to get well; or because, •as he said, “He would show them that he wasn’t a dead man yet;” or if, as is vaguely intimated, others influenced him to recall his action; or if these sons by their ungrateful conduct after the execution of these deeds caused this old man to regret what he had done and to seek to undo it, it would afford this court no pretext to set aside the deeds under the circumstances of -the case.
I .am therefore of opinion and I so find that the relief here sought must be denied >and that the petition be dismissed. Decree accordingly.